Affirmed by unpublished opinion. Judge GREGORY wrote the majority opinion, in which Judge WYNN joined. Judge KING wrote a dissenting opinion.
Unpublished opinions are not binding precedent in this circuit.
GREGORY, Circuit Judge:
In this case, Plaintiffs-Appellees Peggy Russ and Taffy Gause asserted a number of claims for relief against the former sheriff of New Hanover County, Sid Cau-sey, and a number of his deputies in both their individual and official capacities. Their claims are premised on the defendants’ conduct during the arrest of their son and brother, respectively, Gladwyn Taft Russ, III (“GT Russ III”)[1] at the funeral of their husband and father, Gladwyn Taft Russ Jr. (“GT Russ Jr.”). Specifically, Russ and Gause alleged (1) deprivation of their Fourth Amendment right to privacy in violation of 42 U.S.C. § 1983, (2) assault; (3) intentional infliction of emotional distress, (4) negligent infliction of emotional distress, (5) invasion of privacy, and (6) negligence. The defendants asserted various defenses, including governmental immunity and public officer’s immunity, and moved for summary judgment. On August 5, 2010, the district *269 court granted in part and denied in part the defendants’ motion for summary judgment.
At issue on appeal is the district court’s denial of defendants Eric Brown, B. Matt Jordan, and Doug Price’s motion for summary judgment as to the Plaintiffs-Appellees’ state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. In addition to allowing these claims to proceed against the defendants in them official capacities,[2] the district court allowed these claims to proceed against defendants Brown, Jordan, and Price in their individual capacities, denying defendants’ affirmative defense of public officer’s immunity. Defendants argue that the district court erred in concluding that Brown, Jordan, and Price were not entitled to public officer’s immunity as a matter of law because Plaintiffs-Appellees failed to produce evidence that the deputies’ actions were corrupt, malicious, or outside the scope of their official duties. We disagree. Because Plaintiffs-Appellees have put forth facts sufficient to create a genuine issue of material fact as to whether the officers acted with malice, an exception to public officer’s immunity, we affirm the denial of summary judgment.[3]
I.
We begin our analysis with a reconstruction of the events that transpired and gave rise to these claims. We then examine the malice exception to public officer’s immunity as applied to Plaintiffs-Appellees’ claims.
A.
On August 6, 2008, Glenda Sellars swore out a communicating-threats complaint against her husband, GT Russ III. A magistrate judge then issued a warrant for his arrest. Between August 8, 2008, and November 8, 2008, New Hanover County sheriffs deputies attempted to serve the warrant on GT Russ III at his mobile home located directly behind his parents’ home. On each of these occasions, the deputies were unable to locate GT Russ III or otherwise serve the warrant. Russ, the mother of GT Russ III, personally saw sheriffs deputies attempt to serve the warrant three times and informed the deputies that GT Russ III and Sellars had reconciled and were in Tennessee and that Sel-lars wanted to withdraw her complaint and drop the charges against GT Russ III.
On November 1, 2008, GT Russ III returned to North Carolina to be with his *270 father, GT Russ Jr., whose health was deteriorating rapidly. Upon his return, GT Russ III did not attempt to surrender or turn himself in, nor did Russ inform anyone from the sheriffs office that GT Russ III was back in town. Plaintiffs-Appellees and GT Russ III appeared to believe— incorrectly — that the criminal complaint had been withdrawn, and they were otherwise preoccupied with the failing health of GT Russ Jr.
On November 8, 2008, the sheriffs office responded to a 9-1-1 call from GT Russ Ill’s son, who stated that his father had slashed the tires and smashed the windows of his car and locked himself inside the house of Russ. Deputy Gonzalez, who had previously attempted to serve the arrest warrant on GT Russ III on a number of occasions, was the first to arrive on the scene. He verified the property damage and hoped to be able to serve the arrest warrant on GT Russ III. GT Russ Ill’s son advised Deputy Gonzalez that GT Russ III was alone in the house and that he had access to firearms. Deputy Gonzalez radioed for backup.
After backup arrived, Deputy Gonzalez knocked on the door of the house and demanded that GT Russ III surrender to him, but GT Russ III refused to do so. Plaintiffs-Appellees arrived on the scene but were directed to stay away from the house. Russ gave the deputies the keys to her house so that they could enter and arrest GT Russ III. Chief Deputy Sheriff Ed McMahon, who was second in command at the time (now Sheriff of New Hanover County), came to the house and spoke with GT Russ III over the telephone. GT Russ III informed McMahon that he had returned to North Carolina to be with his father during surgery to be performed on November 10, 2008. McMahon verified this with the Plaintiffs-Appel-lees and other family members, who also informed him that Sellars was not in North Carolina at the time. After speaking with GT Russ III and Plaintiffs-Appel-lees, McMahon agreed to allow GT Russ III to turn himself in following his father’s surgery. The deputies left the scene and Russ, Gause, and GT Russ III went to GT Russ Jr.’s bedside at the hospital.
GT Russ III did not turn himself in on November 10, 2008. On that day, GT Russ Jr.’s condition worsened and on November 11, 2008, he died. Deputy Gonzalez arrived at Russ’s house on November 11, 2008, seeking to serve the warrant on GT Russ III. During his visit, Russ notified the deputy that her husband had died and asked the deputy to notify Chief Deputy McMahon of that fact. On Wednesday, November 12, or Thursday, November 13, 2008, Russ and GT Russ III spoke with McMahon. During those conversations both notified him that GT Russ Jr. had died and that the family was busy making funeral arrangements for GT Russ Jr., who was to be buried with military honors. McMahon agreed to allow GT Russ III to turn himself in after his father’s funeral. McMahon recounted his conversation with Russ where he admits agreeing to have GT Russ III turn himself in after the funeral:
Q: Do you remember saying, “Okay, that is fine”? What did you say in response to that?
A: I am sure I said, “Okay.”
Consistent with that discussion, no efforts were made by the sheriffs office to serve the warrant or to contact GT Russ III about the warrant. Further, sheriffs deputies were specifically instructed not to go back to the house.
However, on November 13, 2008, McMahon and other senior law enforcement officers in the sheriffs office, worried that GT Russ III would not turn himself in, decided that their best chance to serve the *271 arrest warrant would be to do so after the funeral service, which they were confident GT Russ III would attend. McMahon, after speaking with Causey, authorized the arrest of GT Russ III at some point after the funeral, to be carried out as discretely and quickly as possible, but left the details of the arrest plan to Price. Price created the Incident Action Plan that details the arrest plan. Deputies Brown and Jordan were to wear plain clothes as they approached GT Russ III and arrest him in the parking lot of Andrews Valley Mortuary immediately following his father’s funeral service. Price relayed this plan to McMahon.
The funeral of GT Russ Jr. was set for November 15, 2008, and it was intended to be a private ceremony. Plaintiffs-Ap-pellees and GT Russ III went to the mortuary early in the morning together to ensure everything was being set up appropriately for the service. GT Russ III drove his truck to the funeral service at Andrews Valley Mortuary. The service began at 1:00 or 2:00 p.m. with family members and friends paying their respects to GT Russ Jr. and the Russ family-
Prior to the funeral service, Brown and Jordan, who were wearing civilian suits and ties, drove to an adjacent animal hospital to observe the funeral home and then parked their unmarked car in an empty parking space in the funeral home’s parking lot once all of the funeral attendees had gone inside. No one from the sheriffs office had notified Andrews Valley Mortuary that they would attempt to serve a warrant at the funeral service.
After the service concluded, Plaintiffs-Appellees exited the funeral home through 'the front entrance and went into the limousine. The parties differ as to exactly what happened after GT Russ III exited the funeral home at the conclusion of the service, although their versions of events do overlap. Accepting Plaintiffs-Appellees’ version as true where there are differences, the arrest occurred as follows: GT Russ III was the pallbearer for his father’s casket and the casket went out the side door of the mortuary where the hearse was parked under the carport. Ronald Simmons was also a pallbearer on the left side with GT Russ III and John Hoy from Andrews Valley Mortuary was assisting the pallbearers in the transportation of the casket. As GT Russ III was putting his father’s casket into the hearse, two gentlemen in suits and ties approached. Price had given permission for Deputies Brown and Jordan to approach the funeral at this time. Ronald Simmons was an arm’s length away from GT Russ III and initially thought that the men were friends or family that had attended the funeral.
Brown then violently grabbed GT Russ III and threw him up against the hearse. Deputy Brown never identified himself as law enforcement nor did he inform GT Russ III that he was under arrest. GT Russ III broke loose from Brown, not knowing who he was, and Hoy and Simmons thought they were criminals attacking GT Russ III.
As Plaintiffs-Appellees were seated in the limo they heard a loud noise from GT Russ III being thrown against the hearse and a lot of screaming. They went over to the commotion surrounding the hearse. During the scuffle with GT Russ III, Brown’s back-up firearm had become dislodged and had fallen to the pavement. In an attempt to control the crowd, defendant Jordan drew his Taser, which to Plaintiffs-Appellees appeared to be a firearm. Neither defendant Jordan nor defendant Brown had identified themselves at this point. When asked by Russ and Gause who they were and what they were doing, the deputies refused to identify themselves *272 and threatened to shoot bystanders. Plaintiffs-Appellees contend that during this time the deputies were waving their Tasers wildly at the attendees and pointing them at Plaintiffs-Appellees faces as they stood a few feet away. Brown then employed his Taser against GT Russ III in order to subdue him. Plaintiffs-Appellees allege that during all this time neither Brown nor Jordan identified themselves and that they and others at the funeral feared for their lives.
At some point during the arrest of GT Russ III, Brown and Jordan radioed for assistance. Price and another deputy, who had been maintaining positions around the funeral home to prevent escape, responded and arrived at the scene at about the time GT Russ III was placed in handcuffs. After seeing GT Russ III handcuffed, attendees understood that these individuals were law enforcement officers. The attendees wanted answers from Price as to why this happened, to which he responded that he would take everyone to jail if they did not calm down. It is further alleged that Price was rude during this discussion, further exacerbating the situation. Eventually, Brown and Jordan transported GT Russ III to New Hanover County Detention Center.
It took Andrews Valley Mortuary approximately thirty minutes to restore order to the service and many people in attendance did not continue to the cemetery for the burial. The Plaintiffs-Appel-lees went to the cemetery in shock. The next day, or shortly thereafter, Russ and her family requested a meeting with McMahon where McMahon apologized and indicated that there was a miscommunication and that the arrest was supposed to have occurred after the burial. The law enforcement officers involved in the arrest were orally reprimanded by Sheriff Cau-sey.
The events at the funeral were “the most horrible thing” Russ has ever gone through and neither she nor Gause have received closure for their husband and father’s death. Consistent with Plaintiffs-Appellees’ experience, funeral attendees were mortified and shocked by what happened.
B.
Brown, Jordan, and Price are public officers shielded from personal liability under North Carolina’s doctrine of public officer’s immunity unless it is alleged and proved that their actions, or lack thereof, were of a nature that pierces the cloak of this immunity.[4] Accordingly, in order to sustain a personal or individual capacity suit against Brown, Jordan, and Price for the state law claims, Plaintiffs-Appellees “must initially make a prima facie showing that the defendant-official’s tortuous conduct falls within one of the immunity exceptions.” Trantham v. Lane, 127 N.C.App. 304, 488 S.E.2d 625, 627 (1997).
As a preliminary matter, defendants assert that Plaintiffs-Appellees’ claims for negligent infliction of emotional distress *273 and negligence are, by their very definition, claims for negligence and because public officers may not be held personally hable for negligence, the officers are entitled to public officer’s immunity as to these claims.
In support of this proposition, defendants’ cite to this Court’s holding in Shaw v. Stroud that a “negligent infliction of emotional distress claim, by its very definition, necessarily alleges only negligence. Therefore, [the defendant state trooper] [wa]s absolutely immune [individually] from any negligent infliction of emotional distress claim under North Carolina law.” Shaw v. Stroud, 13 F.3d 791, 803 (4th Cir.1994) (rejecting plaintiffs claim that gross negligence is sufficient to pierce public official immunity). In Shaw, however, the plaintiff was arguing that gross negligence was sufficient to pierce an officer’s immunity. There were no allegations of malicious or corrupt actions or actions beyond the scope of the officer’s duties, exceptions to public officer’s immunity that this Court in Shaw explicitly acknowledged. Id. (“While intentional, malicious, or corrupt actions may pierce an officer’s immunity, the North Carolina Supreme Court has never allowed a showing of gross negligence to suffice to pierce an officer’s immunity-”). Further, the North Carolina Court of Appeals has explicitly held that negligence actions can be maintained if, in addition to the elements of a negligence claim, plaintiffs allege and prove that the officer’s actions were corrupt or malicious or beyond the scope of the officer’s duties:
While we recognize that generally, claims of negligence can not be maintained against public officials in their individual capacity, these actions may be maintained, if plaintiffs bring forth evidence sufficient to ‘pierce the cloak of official immunity.’
Prior v. Pruett, 143 N.C.App. 612, 550 S.E.2d 166, 171 (2001) (emphasis added); see also, Sehlossberg v. Goins, 141 N.C.App. 436, 540 S.E.2d 49, 56 (2000) (quoting Slade v. Vernon, 110 N.C.App. 422, 429 S.E.2d 744, 747 (1993)) (“Under the public officers’ immunity doctrine, ‘a public official is [generally] immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties’.”). It is not the elements of the claim that determine whether a public official is entitled to public officer’s immunity. Rather, it is whether the facts alleged are sufficient to pierce the cloak of immunity, so as to strip the official of that immunity and allow plaintiffs to sue the official “as if the suit had been brought against ‘any private individual.’ ” Id.
Under North Carolina law, it is clearly established that “where a defendant performs discretionary acts as part of his or her official or governmental duties, to sustain a suit for personal or individual liability, a plaintiff must allege and prove that the defendant’s acts were malicious or corrupt.” Sehlossberg v. Goins, 141 N.C.App. 436, 540 S.E.2d 49 (2000) (citing Wilkins v. Burton, 220 N.C. 13, 16 S.E.2d 406, 407 (1941)). Here, it is undisputed that Brown, Jordan, and Price were on duty during the afternoon of November 15. “Moreover the decisions made by [the officers] in attempting to restrain and arrest [an individual] were discretionary decisions made during the course of performing their official duties as public officers.” Sehlossberg, 540 S.E.2d at 54. Because the deputies were engaged in discretionary acts as part of their official duties and Plaintiffs-Appellees do not allege that the deputies’ actions were corrupt, the only relevant question for purposes of the public officer’s immunity analysis is whether *274 Plaintiffs-Appellees have put forth sufficient evidence of malice to survive summary judgment.
The district court found that the plaintiffs “put forward sufficient evidence of extreme and outrageous conduct and reckless indifference” to support a showing of malice and overcome the defense of public officer’s immunity. It is presumed that a public official in the performance of his official duties “acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest.” Greene v. Town of Valdese, 306 N.C. 79, 291 S.E.2d 680, 632 (1982) (citations omitted). “Thus, to overcome the presumption of good faith in favor of a public official, the burden is on the plaintiff to offer a sufficient forecast of evidence to establish ... the public officials’ actions were malicious.... ” Crocker v. Griffin, No. COA09-1000, 2010 WL 1961258 at *6 (N.C.App. May 18, 2010).
Acts of malice are one exception to the doctrine of public officer’s immunity, a doctrine where “public officials cannot be held individually liable for damages caused by mere negligence in the performance of their governmental or discretionary duties.” Meyer v. Walls, 347 N.C. 97, 489 S.E.2d 880, 889 (1997). “A defendant acts with malice when [ ] he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and [] which he intends to be prejudicial or injurious to another.” In re Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888, 890 (1984). The Supreme Court of North Carolina explained that “[a]n act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.” Id. at 890-91 (quoting Givens v. Sellars, 273 N.C. 44, 159 S.E.2d 530, 535 (1968)). When the definition of “wanton” is grafted into the definition of “malice,” Grad establishes a three pronged framework providing that malice, for the purposes of piercing the cloak of public officer’s immunity, may be demonstrated by conduct: (1) “when done needlessly, manifesting a reckless indifference to the rights of others,” 321 S.E.2d at 890-91; (2) “which a [person] of reasonable intelligence would know to be contrary to [their] duty,” id. at 890; and (3) “which [is] intended] to be prejudicial or injurious to another.” Id.
Regarding the first prong, we agree with the district court that Plaintiffs-Ap-pellees put forth sufficient evidence that the officers needlessly engaged in conduct, manifesting a reckless indifference to the rights of others. Our conclusion is based on the Plaintiffs-Appellees’ evidence of the following conduct of Brown, Jordan, and Price: Brown and Jordan grabbed GT Russ III during his father’s funeral while GT Russ III was putting the casket into the hearse; the deputies failed to identify themselves as police officers; Jordan threatened to use his Taser on elderly and particularly emotional bystanders attending the funeral; Price planned the arrest and threatened to arrest, other funeral attendees who sought explanation; and the officers and their supervisors were brutish and bullying toward grieving family and friends.
Further, Plaintiffs-Appellees have presented evidence sufficient to show that the actions of Brown, Jordan, and Price were actions an officer “of reasonable intelligence would know to be contrary to his duty.” Grad, 321 S.E.2d at 890. Brown and Jordan passed a Basic Law Enforcement Training (“BLET”) course and exam, which provides the “minimum standards” for law enforcement officers in the state of North Carolina. The BLET course discussed the proper procedure for arresting individuals. The policies are listed as fol *275 lows: “(1) Identify Self as an officer, (2) Inform suspect he or she is ‘under arrest’ and (3) State reason(s) for the arrest.” This evidence — when viewed in the light most favorable to Plaintiffs-Appellees— makes clear that defendants failed to follow even one of those basic rules of law enforcement before effectuating the arrest of GT Russ III. In addition, N.C. Gen. Stat § 15A-401(c) supports the BLET tenets for making an arrest:
(2) Upon making an arrest, a law-enforcement officer must:
a. Identify himself as a law-enforcement officer unless his identity is otherwise apparent
b. Inform the arrested person that he is under arrest, and
c. As promptly as is reasonable under the circumstances, inform the arrested person of the cause of the arrest, unless the cause appears to be evident.
N.C. Gen. Stat § 15A-401(c).
Contrary to the dissent’s assertion, the relevant “duty” of the officers — rather than a duty to refrain from arresting Mr. Russ at the funeral home, post at 28 — was the duty not to engage in extreme and outrageous conduct intended to cause, and in fact causing, severe emotional distress to Plaintiffs-Appellees. In this regard, and thus in respect of the second prong of malice, it is relevant that the officers’ alleged conduct occurred during a funeral. The Supreme Court of North Carolina has long recognized that a funeral is a solemn event that creates certain rights in mourners and requires that special care be taken by third parties. Floyd v. Atl. Coast Line Ry. Co., 167 N.C. 55, 83 S.E. 12, 12-13 (1914) (“There is a duty imposed by the universal feelings of mankind to be discharged by someone toward the dead, a duty, and we may also say a right, to protect from violation, and a duty on the part of others to abstain from violation.”); cf. Parker v. Quinn-McGowen Co., 262 N.C. 560, 138 S.E.2d 214 (1964) (noting that next of kin has a quasi-property right in a deceased body for its burial and there arises out of that right an emotional interest which should be protected and which others have a duty not to injure intentionally or negligently); Lamm v. Shingleton, 231 N.C. 10, 55 S.E.2d 810, 813 (1949) (“The tenderest feelings of the human heart center around the remains of the dead.”).
Other states, and other courts, have similarly recognized the rights and protections afforded by law to funerals and burials. See, e.g., Holland v. Metalious, 105 N.H. 290, 198 A.2d 654, 656 (1964) (“The right to ‘decent’ burial is one which has long been recognized at common law, and in which the public as well as the individual has an interest”); King v. Elrod, 196 Tenn. 378, 268 S.W.2d 103, 105 (1953) (“[T]he right to decent burial is well guarded by the law, and relatives of a deceased are entitled to insist upon legal protection for any disturbance or violation of this right.” (citation omitted)); Koerber v. Patek, 123 Wis. 453, 102 N.W. 40, 43 (1905) (“We can imagine no clearer or dearer right in the gamut of civil liberty and security than to bury our dead in peace and unobstructed.... [N]one where the law need less hesitate to impose upon a willful violator responsibility for the uttermost consequences of his act.”); cf. Snyder v. Phelps - U.S. -, -, 131 S.Ct. 1207, 1227-1228, 179 L.Ed.2d 172 (2011) (Alito, J., dissenting) (explaining that “the emotional well-being of bereaved relatives is particularly vulnerable” at funerals because intrusions “may permanently stain their memories of the final moments before a loved one is laid to rest,” and, as a result, “funerals are unique events at which special protection against emotional assaults is in order”); Nat’l Ar *276 chives & Records Admin, v. Favish, 541 U.S. 157, 167-70, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004) (noting that “[bjurial rites or their counterparts have been respected in almost all civilizations from time immemorial,” and further noting that funerals “are a sign of the respect a society-shows for the deceased and for the surviving family members”).[5]
As to the third prong of malice under Grad, Plaintiffs-Appellees must produce at least some evidence that the defendants “intend[ed] to be prejudicial or injurious to another.” Kaasa, 321 S.E.2d at 890; see Hawkins v. State of North Carolina, 117 N.C.App. 615, 453 S.E.2d 233, 242 (1995). North Carolina courts have found summary judgment inappropriate where there is a genuine issue of fact as to an officer’s state of mind when engaging in allegedly tortious conduct.[6] See, e.g., Showalter v. N.C. Dept, of Crime Control & Public Safety, 183 N.C.App. 132, 643 S.E.2d 649 (2007) (finding summary judgment inappropriate on public officer’s immunity where trooper stated he did not act maliciously but where trooper’s actions in macing plaintiff and dragging him from car during traffic stop created a genuine issue of fact as to whether actions were done with malice); Thompson v. Town of Dallas, 142 N.C.App. 651, 543 S.E.2d 901, 905 (2001) (finding that genuine issue of material fact as to whether officer acted with malice in arresting motorist precluded summary judgment on punitive damages claim).
Arguably, the very act of selecting the moment a grieving son places his father’s casket into a hearse to execute his arrest in front of his family and innocent third party attendees demonstrates an intent to injure him, his family, and anyone else at the funeral grieving the decedent’s death. This is especially true where, as here, there were numerous opportunities to serve the warrant elsewhere, the sheriffs office had previously promised not to take any action until after the funeral, and the officers did not believe there was any threat necessitating an immediate arrest. As Plaintiffs-Appellees allege, the conduct of Brown, Jordan, and Price is sufficient to create a genuine issue of fact material to the issue of public officer’s immunity, particularly as to the officers’ intent in creating and executing the arrest plan.
II.
For the reasons given above, we affirm the district court’s denial of summary judgment.

AFFIRMED.

. GT Russ III is not a party to this action.

. As to the claims against the defendants in their official capacities — which are in fact claims against the New Hanover County Sheriff’s Office — the district court determined that the defendants were entitled to governmental immunity for damages in excess of $25,000 but that the Plaintiffs-Appellees could recover against the defendants in their official capacities for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence up to $25,000. Because there is no proper basis for an interlocutory appeal of the claims against the defendants in their official capacities, we decline to exercise pendant appellate jurisdiction over the denial of summary judgment as to these claims.

. Thus, although the existence or absence of public officer's immunity may be established, where appropriate, as a matter of law, it is also true that in other cases this issue presents a question of fact to be resolved by the jury. See, e.g., Showalter v. North Carolina Dept, of Crime Control and Public Safety, 183 N.C.App. 132, 137, 643 S.E.2d 649, 652 (2007) (affirming denial of summary judgment because of open genuine issues of material fact in relation to officer's alleged malice precluded judgment as a matter of law on the basis of public officer’s immunity).

. It is well established that federal courts, when interpreting North Carolina law, "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding....” Iodice v. United States, 289 F.3d 270, 275 (4th Cir.2002). Consistent with this deference to state law, holdings by the North Carolina Court of Appeals on a point of North Carolina law are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.” West v. Amer. Tel. & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940); see also Comm'r of Internal Revenue v. Bosch’s Estate, 387 U.S. 456, 465, 87’ S.Ct. 1776, 18 L.Ed.2d 886 (1967); Sanderson v. Rice, 777 F.2d 902, 905 (4th Cir.1985), cert. den., 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986).

. Indeed, a number of states have gone so far as to create a special category within the common law tort of negligent infliction of emotional distress for interference with proper burials. See Restatement (Third) Torts § 46 (Tentative Draft No. 5 2007).

. Although allegations of "reckless indifference” in the complaint may be insufficient to survive a motion to dismiss, see, e.g., Jones v. Kearns, 120 N.C.App. 301, 462 S.E.2d 245, 248 (1995), evidence of conduct manifesting a reckless indifference to the rights of others may in some cases be "substantial evidence” from which a jury may properly infer specific intent to injure. See, e.g., State v. Barlowe, 337 N.C. 371, 379, 446 S.E.2d 352, 357 (1994) ("Intent must normally be proved by circumstantial evidence, and an intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances." (quotation marks and alterations omitted)).