**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2435**

MICHAEL G. MUSSELWHITE; WHITESHIRE FOODS, INC.; LELAND-HWY 17, INC.; SHALLOTTE-HWY, INC.; WILMINGTON-17TH STREET, INC.,

Plaintiffs - Appellants,

v.

MID-ATLANTIC RESTAURANT CORP.; CARY KEISLER, INC.; S.C.N.B., INC.,

Defendants - Appellees.

and

GREGORY MOORE, in his individual and official capacity as Owner and Officer of Mid-Atlantic Restaurant Corporation and Smithfield Management Corporation; SMITHFIELD'S OF SMITHFIELD, INC.; SMITHFIELD'S OF CLAYTON, INC.; DAVID HARRIS, in his individual and official capacity as an Officer of Mid-Atlantic Restaurant Corporation and Smithfield Management Corporation; L. BRIAN CHESHIRE; FLAMINGO SOUTH LLC; FLAMINGO PROPERTIES LLC,

Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Terrence W. Boyle, Chief District Judge. (7:18-cv-00089-BO)

Argued: January 29, 2020                    Decided: April 15, 2020

Before FLOYD, THACKER, and RICHARDSON, Circuit Judges.

Vacated and remanded by unpublished per curiam opinion.

———————

**ARGUED:** James Edward Hairston, Jr., HAIRSTON LANE BRANNON, PA, Raleigh, North Carolina, for Appellants. Christopher S. Edwards, WARD AND SMITH, P.A., Wilmington, North Carolina, for Appellees. **ON BRIEF:** Gary J. Rickner, WARD AND SMITH, P.A., Raleigh, North Carolina, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal involves a long-running business dispute between a North Carolina barbeque restaurant franchisor and a former franchisee. Plaintiff-Appellant Michael G. Musselwhite, the former franchisee, sued Defendant-Appellant Mid-Atlantic Restaurant Corporation (MARC), the franchisor. Though the complaint raised a host of tort and contract claims, its gist was straightforward: MARC had wrongfully interfered with a business agreement between Musselwhite and his long-time business partner, Brian Cheshire. The district court below dismissed all of Musselwhite's claims, however, because it held that the claims were either released under certain contractual provisions or barred by the doctrine of collateral estoppel. Musselwhite appealed. For the following reasons, we vacate the district court's judgment and remand.

I.

From 2000 to 2014, Musselwhite ran four Smithfield's Chicken 'N Bar-B-Q restaurants in North Carolina's New Hanover County with his business partner, Brian Cheshire. To do this, Musselwhite and Cheshire created two sets of corporate entities, each of which they initially owned in equal shares: one set owned the Smithfield's franchises themselves; another set owned the properties on which the restaurants operated. The entities that owned the Smithfield's franchises were Whiteshire Foods, Inc. (Whiteshire); Leland-Hwy 17, Inc. (Leland); Shallotte-Hwy 17, Inc. (Shallotte); and Wilmington-17th

3

Street, Inc. (Wilmington).[1] For each of these respective entities, Musselwhite and Cheshire entered into Franchise Agreements with MARC. And the entities that owned the properties were Flamingo Properties, LLC, which owned the Whiteshire and Wilmington properties, and Flamingo South, LLC, which owned the Shallotte and Leland properties (collectively, the "Flamingo Companies"). For both of these, Musselwhite and Cheshire entered into ownership agreements with each other. In short, Whiteshire, Leland, Shallotte, and Wilmington rented their restaurants' physical spaces from the Flamingo Companies. Within this scheme, Musselwhite managed the restaurants' day-to-day operations, while Cheshire managed their finances.

Musselwhite and Cheshire ran these restaurants without incident until 2015. Early that year, David Harris, a MARC executive, informed them that MARC wished to operate their franchises itself. Musselwhite and Cheshire agreed with this proposal and so executed four agreements on behalf of Whiteshire, Leland, Shallotte, and Wilmington with MARC on February 27, 2015.

---

[1] These four entities are the other Plaintiff-Appellants. They, along with the other Defendant-Appellees—Cary Keisler, Inc. and Smithfield's Chicken 'N Bar-B-Q, Inc.—are variously related to either Musselwhite or MARC. Because this dispute is effectively between Musselwhite and MARC, we use their names as shorthand generally for the rest of the parties unless otherwise noted.

Also, Whiteshire and Wilmington were both voluntarily dissolved on December 31, 2016. Under North Carolina law, however, such a dissolution does not "[p]revent commencement of a proceeding by or against the corporation in its corporate name." N.C. Gen. Stat. § 55-14-05.

4

A few particulars of these agreements merit mention. First, all four agreements contained broad release clauses. Among other things, these clauses' workaday language released MARC from claims that Whiteshire, Leland, Shallotte, and Wilmington may have had against it if they accrued on or before February 27, 2015.

These agreements also transformed the companies' relationships with each other. As for Shallotte and Leland, they chose to terminate their existing franchisor/franchisee relationship with MARC when they executed their "Termination Agreement and Mutual Release" agreements (collectively, the "Termination Agreements"). J.A. 334, 340. Yet Whiteshire and Wilmington took a different tack. They executed "Franchise Agreement Amendment" agreements that only modified—not terminated—their existing Franchise Agreements with MARC (collectively, the "Amendment Agreements"), extending their franchisor/franchisee relationship until December 31, 2017, about a year and a half longer than originally planned. J.A. 346, 352.

And the Amendment Agreements worked one other noteworthy change. Under these agreements, Whiteshire and Wilmington would retain their franchise rights until August 2015, when they would turn them over to MARC. In exchange, MARC would continue to lease the physical space from the Flamingo Companies for a few years. Once these leases were up, MARC could choose to buy the properties themselves from Whiteshire and Wilmington for a substantial sum. Put otherwise, these Amendment Agreements were lucrative for Whiteshire and Wilmington, and thus for Musselwhite and Cheshire, twice over—offering both a lucrative income stream and an even more lucrative potential payout.

5

But around when these changes were made, Musselwhite and MARC's relationship deteriorated. As MARC puts it, Musselwhite mismanaged the restaurants, resulting in not only declining sales but also unsanitary conditions. In fact, Musselwhite's behavior prompted the four agreements, MARC says. Tensions boiled over around May 23, 2015, when Musselwhite and Harris fought at the Whiteshire restaurant. Harris, who Musselwhite says stands at over six feet tall and regularly carries a pistol, arrived at that restaurant and began disparaging Musselwhite's managerial acumen and threatening to terminate both the Whiteshire and Wilmington Franchise Agreements—and ultimately physically barred Musselwhite from the restaurant's premises. And Harris's threat apparently came to pass: A few days later, on May 26, 2015, MARC terminated its Franchise Agreements with Whiteshire and Wilmington by letters. In these letters, MARC cited the restaurants' unprofitability, their unsanitary conditions, and other operational deficiencies as its reasons for terminating the agreements.

This fracas irreparably changed Musselwhite and Cheshire's relationship too. As Musselwhite tells it, Harris began pressuring Cheshire to end his business ventures—that is, his co-ownership of Whiteshire and Wilmington—with Musselwhite, claiming that Musselwhite ineptly managed those restaurants. What's more, MARC also claimed that the Amendment Agreements—and their benefits—would not survive if Musselwhite remained a co-owner of the Flamingo Companies. Cheshire then spoke to Musselwhite and explained that they would receive "nothing" unless Musselwhite divested himself from the Flamingo Companies "on paper." J.A. 19. So, three days after MARC ended its

6

relationship with Whiteshire and Wilmington, Cheshire bought out Musselwhite's share in the Flamingo Companies for $375,000 (hereinafter, the "Buyout Agreement").

Despite this buyout, Musselwhite sued Cheshire in North Carolina state court in January 2016. Amid many contract and tort claims, he essentially alleged that Cheshire had fraudulently induced him to give up his stakes in the Flamingo Companies by falsely claiming that MARC would have terminated the Amendment Agreements if Cheshire did not end his business relationship with Musselwhite.

But the North Carolina state court saw things differently. On February 14, 2018, it rendered a directed verdict for Cheshire, dismissing all of Musselwhite's claims against him with prejudice. First, it concluded that the fraud, fraud-in-the-inducement, and misrepresentation claims failed because Musselwhite relied not on Cheshire's but on Harris's representations in executing the Buyout Agreement. Harris had told him that there "would be no golden parachute" if he did not divest himself from the Flamingo Companies—which he understood to mean that the Amendment Agreements' benefits were contingent on his divestment. J.A. 610. What's more, these and Musselwhite's many other fraud-related claims also failed because Cheshire had made no fraudulent statement with intent to deceive Musselwhite while executing the Buyout Agreement. Rather, Cheshire's statements mainly concerned the details of the Buyout Agreement itself, like how much money Musselwhite would receive, for one.

The court then turned to Musselwhite's unconscionability claim. That claim failed because Musselwhite "was not deprived of the opportunity to make a meaningful choice whether to assent to the terms" of selling his stakes in the Flamingo Companies. J.A. 610.

7

Lastly, the court concluded that Musselwhite ratified these agreements, precluding relief on his contract claims in any event. He did so because he kept accepting payments under the Buyout Agreement—even after he had learned that he need not have divested himself from the Flamingo Companies to receive the Amendment Agreements' benefits.

In all, Musselwhite's claims that Cheshire wrongfully lied to induce him to sell his stakes in the Flamingo Companies failed. He did not appeal.

Instead, Musselwhite turned to federal court. A few months later, on May 23, 2018, he sued MARC in the Eastern District of North Carolina, alleging tortious interference with contract, breach of contract, unjust enrichment, negligent misrepresentation, civil conspiracy, federal antitrust violations, and unfair and deceptive trade practices under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75.1.1. Like his state-court complaint, Musselwhite's complaint here was also straightforward: He alleged that MARC, through Harris, wrongfully interfered with Musselwhite and Cheshire's co-ownership of the Flamingo Companies by inducing Cheshire to execute the Buyout Agreement with Musselwhite.

Musselwhite fared no better there, however, for the district court dismissed all of his claims. It did so in two parts. First, it concluded that all claims premised on acts that occurred before February 27, 2015—when the Termination Agreements and Amendment Agreements were executed—were barred by the release clauses found in each agreement, so it dismissed these claims. It then dismissed the remaining two claims—tortious interference with contract and civil conspiracy—on collateral-estoppel grounds. In doing so, the district court concluded that the state court had considered "Musselwhite's claims

8

that his contractual rights had been interfered with and [that] Harris and his affiliates had conspired to remove him" but concluded that "Musselwhite had not been deprived of 'any meaningful choice' in executing the [Buyout Agreement] which assigned his interests to Mr. Cheshire." J.A. 623 (citation omitted). It also concluded that any wrongdoing by either Cheshire or Harris was obviated by Musselwhite's ratification of the Buyout Agreement. For these reasons, the district court held that Musselwhite was collaterally estopped from bringing these claims.

This timely appeal followed.

## II.

We review a district court's grant of a motion to dismiss de novo, accepting as true all well-pleaded facts in a complaint and construing them in the most favorable light to the non-movant—here, Musselwhite. *Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017).[2]

At the outset, we note that this appeal is more circumscribed than Musselwhite's complaint may suggest. He has "elect[ed] not to proceed with appellate review" of every claim save four—tortious interference with contract, breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices—and only

---

[2] The parties also spill some ink over whether certain other issues have been waived for appellate review. But this waiver rule "is not an absolute one" and the "matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Manning v. Caldwell*, 930 F.3d 264, 271 (4th Cir. 2019) (en banc) (first quoting *Curry v. Beatrice Pocahontas Coal Co.*, 67 F.3d 517, 522 n.8 (4th Cir. 1995); then quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)).

9

to the extent that they are brought by Musselwhite, Whiteshire, or Wilmington. Corrected Opening Br. Appellants 12. A clearer waiver is seldom found, *Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019), so we confine our review accordingly.

Also, a word about the applicable law. The four contested claims on appeal all arise under North Carolina law, and an underlying North Carolina court judgment exists too. As to the former, North Carolina's substantive law applies because those claims are founded on supplemental jurisdiction. *S. Atl. Ltd. P'ship of Tenn., LP v. Riese*, 284 F.3d 518, 530 n.5 (4th Cir. 2002).[3] As to the latter, this Court "must give the same preclusive effect to a state court judgment as the forum that rendered the judgment would have given it," *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008), which means that we apply North Carolina's preclusion law. And in applying North Carolina's law as to both, we do so as it was determined, or as we predict that it would be determined, by the Supreme Court of North Carolina. *Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 528 (4th Cir. 2015).

III.

Our review begins with the district court's collateral-estoppel decision. Musselwhite contends that the district court erroneously applied that doctrine to dismiss his tortious interference with contract claim against MARC, which alleged that MARC

---

[3] Because Musselwhite asserted federal-law claims in his complaint below, subject-matter jurisdiction here is founded on various federal-law bases, including 28 U.S.C. § 1331, rather than diversity of citizenship.

wrongfully induced Cheshire to not perform his original Flamingo Companies agreements by causing Musselwhite to sell his stakes in those companies.

Under North Carolina law, a tortious interference with contract claim has five elements. *Intersal Inc. v. Hamilton*, 834 S.E.2d 404, 413 (N.C. 2019). First, a valid contract between a plaintiff and a third person that confers upon the plaintiff a contractual right against a third person must exist. *Id.* Second, the defendant must know of that contract. *Id.* Third, the defendant must intentionally induce the third person not to perform the contract. *Id.* Fourth, the defendant must act without justification in so inducing. *Id.* And fifth, the defendant's act must result in actual damage to the plaintiff. *Id.* "Malice is an essential element" of this claim. *Free Spirit Aviation, Inc. v. Rutherford Airport Auth.*, 664 S.E.2d 8, 12 (N.C. Ct. App. 2008).[4] So, stated succinctly, this claim requires Musselwhite to prove that MARC intentionally and maliciously induced Cheshire not to perform an existing contract with Musselwhite, which Musselwhite contends he has proven based on Harris's conduct surrounding the Buyout Agreements.

In dismissing this claim, the district court concluded that the state-court judgment conclusively established that MARC lacked malice and so Musselwhite was collaterally

---

[4] Consistent with our deference to state law here, "holdings by the North Carolina Court of Appeals on a point of North Carolina law are 'not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Russ v. Causey*, 468 F. App'x 267, 272 n.4 (4th Cir. 2012) (quoting *West v. AT & T*, 311 U.S. 223, 237 (1940)); *see also Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967); *Sanderson v. Rice*, 777 F.2d 902, 905 (4th Cir. 1985).

11

estopped from bringing it.  As we explain next, the state-court judgment did no such thing, so collateral estoppel does not bar this claim.

Like many if not most jurisdictions, North Carolina's preclusion doctrine "encompasses two strands: res judicata and collateral estoppel."  *Sartin*, 535 F.3d at 287. In general, collateral estoppel, also known as issue preclusion, prevents parties from relitigating factual or legal issues already adjudicated in an earlier matter.  *Sykes v. Blue Cross & Blue Shield of N.C.*, 828 S.E.2d 489, 494 (N.C. 2019).[5]  This is so because the doctrine advances "the twin policy goals of 'protecting litigants from the burden of relitigating previously decided matters and promoting judicial economy by preventing needless litigation.'"  *Whitacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 880 (N.C. 2004) (quoting *Bockweg v. Anderson*, 428 S.E.2d 157, 161 (N.C. 1993)).

Though other variations exist, relevant here is defensive non-mutual collateral estoppel.  This "means that a stranger to the [earlier] judgment, ordinarily the defendant in the second action"—here, MARC—"relies upon a former judgment as conclusively establishing in [its] favor an issue"—here, that MARC acted without malice.  *Mays v. Clanton*, 609 S.E.2d 453, 455 (N.C. Ct. App. 2005) (quoting *Johnson v. Smith*, 388 S.E.2d 582, 584 (N.C. Ct. App. 1990)).  Defensive non-mutual collateral estoppel is permitted if the party being collaterally estopped "had a full and fair opportunity to litigate" the issue

---

[5] By contrast, res judicata, or claim preclusion, prevents parties from relitigating claims that were or could have been adjudicated in an earlier matter between them.  *Sartin*, 535 F.3d at 287.

in the earlier suit, *Sartin*, 535 F.3d at 288, and if the following four requirements for collateral estoppel generally are met.

First, the issues must be "the same as those involved in the prior action." *Sykes*, 828 S.E.2d at 494 (quoting *State v. Summers*, 528 S.E.2d 17, 20 (N.C. 2000)). "A very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical. If they are not identical," then collateral estoppel is inapplicable. *Beckwith v. Llewellyn*, 391 S.E.2d 189, 191 (N.C. 1990).

Second, the issues must "have been raised and actually litigated in the prior action." *Sykes*, 828 S.E.2d at 494. An issue is "actually litigated" if it is "properly raised in the pleadings or otherwise submitted for determination and [is] in fact determined.'" *Williams v. Peabody*, 719 S.E.2d 88, 93 (N.C. Ct. App. 2011) (alteration in original) (quoting *City of Asheville v. State*, 665 S.E.2d 103, 117 (N.C. Ct. App. 2008)).

Third, the issues must have been "material and relevant to the disposition of the prior action." *Sykes*, 828 S.E.2d at 494.

And fourth, "the determination of the issues in the prior action" must have "been necessary and essential to the resulting" final judgment on the merits. *Id.* This requirement cannot be read too literally, however, for when a court "bases its judgment on multiple independent grounds, each of which have been fully litigated," each independent ground is

13

accorded preclusive effect. *Propst v. N.C. Dep't of Health & Human Servs.*, 758 S.E.2d 892, 897 (N.C. Ct. App. 2014).[6]

Most essentially, the issues in the state-court judgment and the issue in Musselwhite's tortious interference with contract claim are different. The state-court judgment conclusively answers whether Cheshire fraudulently induced Musselwhite to enter the Buyout Agreement or otherwise wrongfully lied to him while buying out his stakes in the Flamingo Companies. But it does not conclusively answer whether MARC, through Harris, acted maliciously in any way. It just makes clear that Harris in fact said or did certain things. Take Harris's "no golden parachute statement," for instance. The state court did not pass on the maliciousness of that statement one way or another; its judgment just conclusively resolved the fact that Harris said that to Musselwhite. Even were that statement malicious, though, it would not have been "necessary and essential" to the state-court judgment: The issue necessary to the state court's conclusion that Musselwhite's fraud-in-the-inducement claim against Cheshire failed is the fact that Musselwhite relied on Harris's representations—not the legal conclusion that those

---

[6] Jurisdictions are split on this point. Some, like North Carolina, follow the Restatement (First) of Judgments and so accord preclusive effect to each fully adjudicated independent ground. *See Propst*, 758 S.E.2d at 892; *see also Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 251–54 (3d Cir. 2006) (collecting cases). *See generally* Restatement (First) of Judgments § 68 cmt. n (Am. Law Inst. 1942). Others, by contrast, follow the Restatement (Second) of Judgments and refuse to accord preclusive effect to such alternate independent grounds. *See Jean Alexander*, 458 F.3d at 252 (collecting cases); *see also Herrera v. Wyoming*, 139 S. Ct. 1686, 1710 (2019) (Alito, J., dissenting) (discussing these divergent positions). *See generally* Restatement (Second) of Judgments § 27 cmt. i (Am. Law Inst. 1982).

representations were either malicious or not. Throughout, the state court never passed on Harris's maliciousness not only because that issue was not before it but also because it was unnecessary to do so.

In concluding otherwise, the district court was wide of the mark. It relied on the state-court judgment establishing that Musselwhite had "a meaningful choice" when executing the Buyout Agreement to hold that this judgment conclusively answers that MARC lacked malice. But that reliance is misplaced, for that finding relates to Musselwhite's unconscionability claim against Cheshire. Under North Carolina law, an agreement is unconscionable if its provisions are "so one-sided that the contracting party is denied any opportunity for a meaningful choice." *Tillman v. Commercial Credit Loans, Inc.*, 655 S.E.2d 362, 369 (N.C. 2008). So this conclusion does not mean that Harris acted without malice; it just means that the Buyout Agreement's terms were not impermissibly one-sided nor was its execution attended by unfair surprise. Put differently, one may enter into a contract that is not unconscionable yet still be harmed by another's tortious interference in so entering because, but for that new contract, one may have earned more under an existing contract—the very one that was tortuously interfered with. Similarly, one may ratify a voidable contract yet still be harmed from another's tortious interference, for accepting those benefits later does not retroactively cure the harm suffered earlier. The district court read the state-court judgment too broadly here.

In like manner, MARC's arguments are also unavailing. It contends that the state court's findings—that Musselwhite spent insufficient time at the restaurants, that many operational issues threatened public health and safety, and that the restaurants were

15

underperforming financially—conclusively establish that it had a legitimate business reason to act as it did, and so it acted without malice. But this overlooks collateral estoppel's necessity requirement. However literally true any of these findings may be, none are "necessary and essential" to the state court's final judgment—one that revolved around, essentially, whether the Buyout Agreement was lawful and lawfully executed, not whether Musselwhite was actually an absentee franchisee. Countenancing this argument here would impermissibly expand collateral estoppel's precise and precisely applied purview.

In sum, Musselwhite is not collaterally estopped from bringing this claim, and the district court erred in concluding differently.[7]

IV.

Our conclusion that Musselwhite is not collaterally estopped from bringing a tortious interference with contract claim against MARC does not end our review, however, for Whiteshire and Wilmington also argue that the district court erred in dismissing some of their claims against MARC.

---

[7] MARC also argues that Musselwhite did not sufficiently allege a tortious interference with contract claim because the legal propriety of the Buyout Agreement means that MARC could not have induced Cheshire not to perform an earlier contract. Because the district court disposed of this issue on collateral-estoppel grounds, we do so too, and so we need not reach that issue. *See Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 515 (4th Cir. 2015).

In particular, Whiteshire and Wilmington, through Musselwhite, contend that the district court erroneously dismissed three of their claims—breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices—because they were barred by the Amendment Agreements' release clauses. In dismissing these claims, the district court first concluded that the release clauses were valid under North Carolina law. *See Hardin v. KCS Int'l, Inc.*, 682 S.E.2d 726, 735 (N.C. Ct. App. 2009) ("'[A] comprehensively phrased general release, in the absence of proof of contrary intent, is usually held to discharge all claims . . . between the parties." (alteration in original) (quoting *Koch v. Bell, Lewis & Assocs., Inc.*, 627 S.E.2d 636, 639 (N.C. Ct. App. 2006))). Then, it concluded that the clauses barred all claims accruing before February 27, 2015. Lastly, it held that these three claims accrued before that day and, at any rate, anything that happened after February 27, 2015 was immaterial because no contracts existed among Whiteshire, Wilmington, and MARC then.

Whiteshire and Wilmington's argument is simple: The district court was factually mistaken. Because Whiteshire and Wilmington's Amendment Agreements did not terminate any contracts, and because they allege that the acts giving rise to these claims happened in May 2015, these claims arose after the release clauses' operative dates and while contracts among Whiteshire, Wilmington, and MARC existed and so are not barred by those clauses.

Their argument is also correct. True enough, the release clauses found in both the Termination Agreements and the Amendment Agreements released certain claims by Whiteshire, Wilmington, Leland, or Shallotte against MARC arising under the Franchise

17

Agreements through February 27, 2015. Yet, unlike the Termination Agreements, Whiteshire and Wilmington's Amendment Agreements were simply "intended to modify"—not terminate—the original Franchise Agreements, extending the term of those agreements until December 31, 2017. J.A. 346. What's more, the complaint alleges that the events around May 23, 2015—the altercation between Harris and Musselwhite and the letters that MARC sent—gave rise to three actionable claims by Whiteshire and Wilmington: breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive trade practices. So the district court erroneously concluded not only that these claims were premised on acts that happened before February 27, 2015 but also that they happened while no contracts among the parties existed.

In brief, the district court erroneously dismissed these three claims as it did. Whatever other infirmities may exist for them, they are not infirm by dint of the Amendment Agreements' release clauses.

V.

For the foregoing reasons, the judgment of the district court is vacated, and this matter is remanded for further proceedings consistent with this opinion. In light of the remaining claims, *see United States v. Susi*, 674 F.3d 278, 283 (4th Cir. 2012); *United States v. Bell*, 5 F.3d 64, 67 (4th Cir. 1993), and the parties' citizenship, the district court may wish to consider its supplemental jurisdiction, *see* 28 U.S.C. § 1367(c); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).

*VACATED AND REMANDED*