IN THE SUPREME COURT OF NORTH CAROLINA

No. 248A18

Filed 14 June 2019

SUSAN SYKES d/b/a ADVANCED CHIROPRACTIC AND HEALTH CENTER, DAWN PATRICK, TROY LYNN, LIFEWORKS ON LAKE NORMAN, PLLC, BRENT BOST, and BOST CHIROPRACTIC CLINIC, P.A.

v.

BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, CIGNA HEALTHCARE OF NORTH CAROLINA, INC., MEDCOST, LLC, and HEALTHGRAM, INC.

Appeal pursuant to N.C.G.S. § 7A-27(a) from an order and opinion entered on 5 April 2018 by Judge James L. Gale, Chief Business Court Judge, in Superior Court, Forsyth County, after the case was designated a mandatory complex business case by the Chief Justice under N.C.G.S. § 7A-45.4. Heard in the Supreme Court on 5 March 2019.

*Oak City Law LLP, by Samuel Pinero II and Robert E. Fields III; and Doughton Blancato PLLC, by William A. Blancato, for plaintiff-appellants.*

*Kilpatrick Townsend & Stockton LLP, by Adam H. Charnes, Elizabeth L. Winters, Peter M. Boyle, pro hac vice, and Christina E. Fahmy, pro hac vice, for Blue Cross and Blue Shield of North Carolina; Fox Rothschild LLP, by D. Erik Albright, and Kirkland & Ellis LLP, by Joshua B. Simon, pro hac vice, Warren Haskel, pro hac vice, and Dmitriy Tishyevish, pro hac vice, for Cigna Healthcare of North Carolina, Inc.; and Ellis & Winters LLP, by Stephen D. Feldman, for Medcost, LLC, defendant-appellees.*

NEWBY, Justice.

This is a companion case to *Sykes v. Health Network Solutions, Inc.*, ___ N.C. ___, ___ S.E.2d ___ (2019) (No. 251PA18) (hereinafter *Sykes I*). Like its companion,

this case raises questions of civil liability based on insurer conduct affecting chiropractic services. Relying on and incorporating its reasoning in *Sykes I*, the trial court dismissed all claims in this case. Our Court has now issued its opinion affirming the trial court's decision in *Sykes I*. Because the decision in *Sykes I* meets the criteria for collateral estoppel, we affirm the trial court's order and opinion in this case.

This case is one of two putative class actions alleging, *inter alia*, that defendant insurers contract with Health Network Solutions, Inc. (HNS) to provide or restrict insured chiropractic services in violation of North Carolina's insurance and antitrust laws. Instead of amending the complaint in the companion case, plaintiffs chose to bring this action against defendant insurers separately from their action against HNS and its individual owners. Nevertheless, both actions present essentially the same claims and rely upon the same theories.

The facts relevant to this case are fully recited in this Court's opinion in *Sykes I*. HNS is an integrated independent practice association consisting of approximately one thousand, or approximately one-half, of North Carolina's active chiropractors. To enroll in HNS, chiropractors must agree to provide in-network care to patients who are covered by various insurers, namely, defendants in the present action, and with whom HNS has entered into exclusive agreements to provide in-network care. Chiropractors who contract to participate in the HNS network pay fees to HNS based on a percentage of the fees that insurers pay for in-network services.

In governing its chiropractors and the services they provide, HNS uses a utilization management (UM) program. Through UM, HNS and defendants review and manage enrolled chiropractors based on the cost per patient. The HNS-enrolled chiropractors may be put on probation and subject to potential termination if their average cost per patient exceeds by more than 50% a mean cost that HNS calculates.

In both of their lawsuits, plaintiffs allege that chiropractors must go through HNS to be deemed "in-network" providers for patients covered by defendant insurers. Plaintiffs contend that HNS's exclusive contracts with defendants enable a "scheme that reduces the number of medically necessary and appropriate treatments" that HNS chiropractors may provide, which has the effect of restricting their output. Plaintiffs contend that these practices allow defendants to avoid paying for medically necessary treatments and appropriate care.

On 30 April 2013, plaintiffs initiated *Sykes I*. In that action plaintiffs asserted five claims for relief: (1) requests for a declaratory judgment on certain facts and law referenced in the complaint, including that the agreements described in the complaint "between HNS and Providers" and "between HNS and the Insurers" are "an illegal restraint of trade and anti-competitive"; (2) antitrust claims based on price fixing, monopsony, and monopoly, alleging that HNS, its owners, and insurers have illegally conspired by "[u]sing the Insurers' market power to fix the price of chiropractic services in North Carolina" and "[u]sing its utilization review procedures to continuously lower the availability of chiropractic services in North Carolina"; (3)

claims under North Carolina General Statutes section 75-1.1 asserting unfair and deceptive trade practices and acts; (4) breach of fiduciary duties that HNS owners and HNS allegedly owe to the providers by, *inter alia,* "promoting a scheme to impede competition and restrict prices"; and (5) a request for punitive damages. Plaintiffs later amended their complaint to add a sixth claim for civil conspiracy.

Plaintiffs outlined four separate product markets in support of their antitrust claims: (1) "the market in which in-network managed care chiropractic services . . . are provided to the Insurers and their North Carolina patients through HNS" (HNS Market); (2) "the market for in-network chiropractic services provided to individual and group comprehensive healthcare insurers and their patients in North Carolina" (Comprehensive Health Market); (3) "the market for insurance reimbursed chiropractic services in North Carolina" (Insurance Health Market); and (4) "the market for chiropractic services provided in North Carolina" (North Carolina Market).

The trial court denied the defendants' initial motion to dismiss the claims in *Sykes I* and stayed additional proceedings pending full discovery on market definition. After discovery, plaintiffs decided to pursue the present case separately in addition to their suit against HNS. Thus on 26 May 2015, plaintiffs filed this action against certain North Carolina insurers, specifically, Blue Cross and Blue Shield of North Carolina, Cigna Healthcare of North Carolina, Inc., and Medcost, LLC

(Insurers).[1]  The case was designated as a mandatory complex business case on 2 June 2015.

In their *Sykes II* complaint plaintiffs asserted essentially the same six claims from *Sykes I* but this time against Insurers:  (1) requests for a declaratory judgment on certain facts and law referenced in the complaint, including that the agreements described in the complaint "between HNS and Providers" and "between HNS and the Insurers" are "an illegal restraint of trade and anti-competitive"; (2) antitrust claims, namely, claims for price fixing, monopsony, and monopoly; (3) claims under North Carolina General Statutes section 75-1.1 asserting unfair and deceptive trade practices and acts based on the antitrust allegations; (4) civil conspiracy; (5) aiding and abetting a breach of fiduciary duty; and (6) a request for punitive damages.

The defendants in *Sykes I* timely filed their motions for partial summary judgment and to dismiss.  Similarly, on 25 September 2015, defendants in the present action moved to dismiss this case.  On 18 August 2017, the trial court issued an order and opinion in *Sykes I* determining that "the proper market to assess the antitrust claims in [the *Sykes I*] litigation must be the North Carolina Market, which includes all insured and uninsured chiropractic services."  Nonetheless, the trial court expressed concern about whether plaintiffs' filings "adequately pleaded market power in the North Carolina Market."  Thus, the court requested supplemental briefing on

---

[1] Plaintiffs also initially named Healthgram, Inc. as a defendant in this action.  On 11 September 2017, however, plaintiffs dismissed their claims against Healthgram.

that issue and denied the defendants' motion to dismiss the antitrust claims to the extent they were premised on the North Carolina Market.

As for the other claims in *Sykes I*, the trial court granted the defendants' motion to dismiss plaintiffs' declaratory judgment claim to the extent it was based on alleged Chapter 58 violations and plaintiffs' claim based on the defendants' purported breach of fiduciary duty. The trial court otherwise denied the motion as to the remaining claims while the antitrust issues remained pending.

After receipt of the supplemental briefing, on 5 April 2018, the trial court issued an order and opinion dismissing plaintiffs' antitrust claims in *Sykes I*, concluding that plaintiffs had not sufficiently pled that the defendants had market power within the North Carolina Market. As for the other claims, the trial court (1) dismissed plaintiffs' declaratory judgment claim premised on the antitrust claims, (2) dismissed plaintiffs' civil conspiracy claim, (3) dismissed all claims against the individual owners of HNS, and (4) dismissed plaintiffs' request for punitive damages, thereby leaving no remaining claims.

On the same day, the trial court issued the order and opinion in the present case dismissing plaintiffs' claims based on their failure to allege defendants' requisite market power in the North Carolina Market. The court noted that "[b]ecause the essential factual allegations in the two actions are the same, the Court appropriately

incorporates and applies its rulings and reasoning in *Sykes I* when resolving the Motions in this case."

The trial court stated that "[t]he sufficiency of market power allegations is a 'threshold inquiry' for [plaintiffs'] Antitrust Claims." *See Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S. Ct. 488, 98 L. Ed. 2d 486 (1987); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.), *cert. denied*, 516 U.S. 987, 116 S. Ct. 515, 133 L. Ed. 2d 424 (1995) (noting that market power may be demonstrated based on facts providing either direct or circumstantial evidence of that power and stating that "circumstantial evidence of market power requires that the plaintiff, at the threshold, define the relevant market"). The trial court agreed with plaintiffs that proof of actual detrimental effects "can obviate the need for an inquiry into market power." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61, 106 S. Ct. 2009, 2019, 90 L. Ed. 2d 445, 458 (1986). Nonetheless, the trial court noted that "Plaintiffs conflate their allegation of a reduction of output *in markets the Court has rejected* with an allegation of reduction of output *in the North Carolina Market*." The trial court opined that an allegation that defendants caused a reduction of chiropractic services among in-network chiropractors cannot be deemed sufficient to allege "a reduction in output among *all chiropractors* in the North Carolina Market." Instead, the trial court reasoned that "the Complaint asserts no facts that suggest more than a shift in output

from the in-network insured market to other segments of the larger North Carolina Market."

The trial court then recognized that plaintiffs' factual assertions of market power involved two related contentions: (1) "Defendants conspired together to reduce output, so the Court should aggregate the Defendant[s'] individual market shares"; and (2) "the market power of all Defendants, especially Blue Cross's alleged market power, is adequate to support a finding of combined market power by all co-conspirators in the North Carolina Market." Thus, the trial court recognized that plaintiffs attempted to assert a combination of vertical and horizontal agreements or conspiracies. The trial court set forth the definitions of each type of conspiracy and opined that plaintiffs' complaint attempted to allege a "hub-and-spokes" or "rimmed wheel" conspiracy, which involves both horizontal and vertical agreements. To adequately allege such a conspiracy, however, a plaintiff must plead facts showing an agreement between the defendants and that "the competitors would benefit only if all the competitors participated in the scheme." The trial court recognized that "mere awareness of a competitor combined with parallel conduct is insufficient to show a horizontal conspiracy." *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 330 (3d Cir. 2010).

Here the trial court recognized that plaintiffs had "not alleged an express agreement between Insurers to reduce output of medically necessary chiropractic care," nor was there any factual allegation that "one Insurer's contract with HNS was

conditioned on HNS contracting with any other Insurer." Instead, plaintiffs' allegation that "[t]he Insurers [were] aware of each other and the market power achieved by combining their patient populations under HNS's umbrella" only showed "mere awareness of a competitor combined with parallel conduct," which is ultimately "insufficient to show a horizontal conspiracy."

Alternatively, the trial court opined that even if it were "mistaken in concluding that Plaintiffs may not aggregate market power because they have not alleged a rimmed wheel conspiracy," it reiterated that plaintiffs "failed to allege that Defendants and HNS in combination possess market power in the North Carolina Market." Though plaintiffs alleged that defendants control "a materially significant percentage" of the North Carolina Market, the court found that plaintiffs "make no effort to further define what a 'materially significant' percentage might be." The trial court also rejected plaintiffs' pleadings involving specific defendants' control of the private health insurance market, opining that "any alleged market power in a narrow, rejected market does not alone support a conclusion" of market power in the North Carolina Market, which notably "is not restricted to insured chiropractic services." Thus, regardless of whether the market itself is sufficiently defined, the trial court noted that a plaintiff must assert more than "[v]ague or conclusory allegations of market power."

Though the trial court recognized North Carolina's more lenient standard for evaluating claims under Rule 12(b)(6), the trial court reasoned that a pleading based

on conclusory allegations unsupported by underlying factual allegations cannot withstand an opposing party's motion to dismiss. Given that the parties conducted full market definition discovery and provided additional briefing, and because plaintiffs' pleading was based on conclusory allegations, the trial court concluded that plaintiffs failed to adequately plead market power in North Carolina. The trial court similarly concluded that plaintiffs failed to plead sufficient market power on the part of each individual defendant, thus warranting dismissal of the antitrust claims under Rule 12(b)(6).

As for the other claims, the trial court relied on its reasoning and conclusions in *Sykes I*: It dismissed plaintiffs' section 75-1.1 claim since it was premised on the alleged antitrust violations and dismissed plaintiffs' Chapter 58 claims because plaintiffs lacked standing to bring those claims. Similarly, the trial court dismissed plaintiffs' claim for aiding and abetting a breach of fiduciary duty, concluding that, as in *Sykes I*, there is "no factual basis to find that HNS owed a fiduciary duty to its network members," meaning defendants here could not have aided and abetted a breach of fiduciary duty where no fiduciary duty existed. But regardless of the merits of that claim, the trial court stated that it would not consider the claim, opining that this Court will not recognize a claim for aiding and abetting breach of fiduciary duty. Even if it did so, however, the trial court concluded that plaintiffs failed to allege each of the elements that would be required to state such a claim.

The trial court similarly determined that all of plaintiffs' declaratory judgment requests must be dismissed in that "each recasts substantive claims that the Court has rejected." Finally, because all other claims had been dismissed and North Carolina does not allow freestanding claims for either civil conspiracy or punitive damages, the trial court dismissed both of plaintiffs' remaining claims.

Plaintiffs appealed to this Court. In their arguments, however, both plaintiffs and defendants conceded that this Court's resolution of *Sykes I* at least in part determines the present case.

This Court reviews de novo a trial court's order on a motion to dismiss. *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013). In doing so, the Court must consider "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Coley v. State*, 360 N.C. 493, 494-95, 631 S.E.2d 121, 123 (2006) (quoting *Thompson v. Waters*, 351 N.C. 462, 463, 526 S.E.2d 650, 650 (2000)).

Collateral estoppel precludes "parties and parties in privity with them . . . from retrying fully litigated issues that were decided in any prior determination and were necessary to the prior determination." *King v. Grindstaff*, 284 N.C. 348, 356, 200 S.E.2d 799, 805 (1973) (citations omitted); *see also Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004) ("[C]ollateral estoppel precludes the subsequent adjudication of a previously determined issue, even if the subsequent

action is based on an entirely different claim." (citing *Hales v. N.C. Ins. Guar. Ass'n*, 337 N.C. 329, 333, 445 S.E.2d 590, 594 (1994))). The doctrine of collateral estoppel "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally." *King*, 284 N.C. at 356, 200 S.E.2d at 805 (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599, 68 S. Ct. 715, 720, 92 L. Ed. 898, 907 (1948)).  Collateral estoppel bars litigation of claims in which

> (1) the issues [are] the same as those involved in the prior action, (2) the issues . . . have been raised and actually litigated in the prior action, (3) the issues [were] material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action [was] necessary and essential to the resulting judgment.

*State v. Summers*, 351 N.C. 620, 623, 528 S.E.2d 17, 20 (2000) (citing *King*, 284 N.C. at 358, 200 S.E.2d at 806).

Here the parties agree that resolving this case at least in part depends on our resolution of *Sykes I*.  Because we affirm the trial court's orders in *Sykes I*,[2] we now conclude that plaintiffs' claims in the present case are barred by collateral estoppel. All elements for collateral estoppel are met here.  First, both *Sykes I* and this action

---

[2] We note that this Court is equally divided in its decision on the antitrust claims and the dependent civil conspiracy claims in *Sykes I*, which means that the trial court's decision on those claims is affirmed without precedential value.  This Court's decision in *Sykes I* affirms the trial court's decision on all remaining claims, i.e., the declaratory judgment claim, unfair and deceptive trade practice claims, breach of fiduciary duty claims, and request for punitive damages.

involve claims requesting a declaratory judgment, alleging antitrust violations, asserting unfair and deceptive trade practices and acts, alleging civil conspiracy, alleging a breach of fiduciary duty (and here, aiding and abetting such a breach), and requesting punitive damages. Second, plaintiffs actually litigated all six claims in *Sykes I*, as evinced by the *Sykes I* orders dismissing all claims after market definition discovery and additional briefing. Third, all six of these claims were material and relevant to the disposition of *Sykes I* because the trial court based its resolution of the action as a whole on the determination of each of the individual claims. Finally, the trial court's orders in *Sykes I* show that these six claims were necessary and essential to the trial court's eventual decision to dismiss all claims in the action. Thus, plaintiffs' claims here are barred by collateral estoppel.

Because collateral estoppel bars plaintiffs from litigating these matters given our resolution of the issues in *Sykes I*, we affirm the trial court's order dismissing plaintiffs' claims in this action.

AFFIRMED.

Justice DAVIS did not participate in the consideration or decision of this case.