IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-831

Filed 06 June 2023

Orange County, No. 21 CVS 1017

RICHARD C. SEMELKA, M.D., Plaintiff,

v.

THE UNIVERSITY OF NORTH CAROLINA, a body politic and corporate institution of the State of North Carolina; THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, a constituent institution of the University of North Carolina; CAROL L. FOLT, sued in her individual and official capacities; JAMES WARREN DEAN, JR., sued in his individual and official capacities; WILLIAM L. ROPER, sued in his individual and official capacities; ARVIL WESLEY BURKS, JR., sued in his official and individual capacities; and MATTHEW A. MAURO, sued in his individual and official capacities, Defendants.

Appeal by defendants and cross-appeal by plaintiff from order entered 24 March 2022 by Judge Allen Baddour in Orange County Superior Court. Heard in the Court of Appeals 12 April 2023.

> *Law Office of Mark L. Hayes, by Mark L. Hayes; and Bailey & Dixon, LLP, by J. Heydt Philbeck, for plaintiff.*

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Kimberly D. Potter, for defendants.*

> *Office of University Counsel, by Marla S. Bowman, for defendant-the University of North Carolina at Chapel Hill.*

ARROWOOD, Judge.

The University of North Carolina ("UNC"), the University of North Carolina at Chapel Hill ("UNC-CH"), Carol L. Folt ("Chancellor Folt"), James Warren Dean, Jr.

("Provost Dean"), William L. Roper ("Dr. Roper"), Arvil Wesley Burks, Jr. ("Dr. Burks"), and Matthew A. Mauro ("Dr. Mauro") (collectively, "defendants") appeal from the trial court's order denying their motion to dismiss.[1] Richard C. Semelka, M.D. ("plaintiff"), cross-appeals. After careful review, we reverse the trial court's order denying defendants' motion to dismiss and dismiss plaintiff's cross-appeal.

## I. Background

Litigation arising from plaintiff's termination of employment from UNC-CH is before this Court for the third time on appeal. Plaintiff exhausted the administrative remedies available under the Administrative Procedures Act, N.C. Gen. Stat. § 150B-1 *et seq.*, by petitioning for judicial review of the final termination decision made by UNC-CH's Board of Governors ("BOG"). This Court upheld the trial court's order affirming plaintiff's discharge in *Semelka v. Univ. of N. Carolina*, 275 N.C. App. 662, 854 S.E.2d 34 (2020) ("*Semelka I*"), *disc. review denied*, 380 N.C. 289, 867 S.E.2d 678 (Mem), *and disc. review dismissed*, 867 S.E.2d 684 (Mem) (2022). The facts underlying plaintiff's termination, including facts discovered in the administrative action, tend to establish the following.[2]

---

[1] Chancellor Folt, Provost Dean, Dr. Roper, Dr. Mauro, and Dr. Burks (collectively, "the individual defendants") were sued in both their official and individual capacities. Chancellor Folt, Provost Dean, and Dr. Roper are no longer employed at UNC-CH. Presently, Dr. Burks serves as Dean of the School of Medicine, Vice Chancellor for Medical Affairs, and CEO of the UNC Health Care System; Dr. Mauro serves as the James H. Scatliff Distinguished Professor of Radiology and President of UNC Faculty Physicians.

[2] Plaintiff challenges the use of outside materials as we are reviewing a motion to dismiss, however, "[t]his Court has long recognized that a court may take judicial notice of its own records in

Plaintiff was formerly employed as a tenured professor within the Department of Radiology at UNC-CH's School of Medicine. On 8 January 2016, plaintiff sent a letter to Chancellor Folt expressing various health and safety concerns within the Department of Radiology and, as Chair of the Radiology Department, Dr. Mauro's "repeated failure to properly address[,]" "or otherwise protect patients and staff[,]" from the harmful conditions created by certain colleagues within the School of Medicine. Plaintiff's letter, which was incorporated into his complaint, also alleged Dr. Mauro "[r]etaliat[ed] against [him] . . . by not appointing [him] as the [D]ivision [C]hief of Abdominal Imaging, but rather select[ing] the only outside candidate that applied."

On 21 January 2016, on behalf of Chancellor Folt, Provost Dean responded to plaintiff's letter. Provost Dean informed plaintiff that his previously communicated concerns were " 'thorough[ly] investigat[ed][,]' " but since they pertained to former colleagues, further disciplinary action was unwarranted. With respect to plaintiff's concerns involving a current faculty member, Provost Dean stated that the matter was also investigated, but found to be without merit. Regarding plaintiff's appointment as Division Chief, Provost Dean stated, " 'any personnel decision is open to a number of interpretations' " and " 'based on a number of factors[,]' " but should

---

another interrelated proceeding where the parties are the same, the issues are the same and the interrelated case is referred to in the case under consideration." *West v. G. D. Reddick, Inc.*, 302 N.C. 201, 202, 274 S.E.2d 221, 223 (1981) (citations omitted). Plaintiff also referred to the administrative action in his complaint.

plaintiff wish to pursue further action, he may contact the University Faculty Grievance Committee for assistance. Provost Dean also offered to meet with plaintiff " 'to further discuss his concerns.' "

Plaintiff "opted not to file a grievance or contact the Ombuds Office[,]" but instead obtained legal counsel for the purported purpose "of assisting him in presenting his health, safety, and work environment concerns directly to UNC-CH's Board of Trustees[.]" In February 2016, plaintiff retained the legal services of Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ("Mintz Levin").

On 13 July 2016, plaintiff submitted an expense reimbursement request to Bob Collichio ("Mr. Collichio"), the Department of Radiology's Associate Chair for Administration, seeking reimbursement for approximately $30,000 in legal fees from the Radiology Department's Operating Fund.[3] In a series of follow-up emails, plaintiff explained his stated reasons for requesting the reimbursement were due to legal consultations he sought in reference to his professional work and were related to his university duties. Plaintiff acknowledged that some prior consultations may have appeared personal in nature, but he contended no more than one and a half

---

[3] The Radiology Department Operating Fund operates in accordance with the UNC School of Medicine Faculty Affairs Code ("Faculty Affairs Code") and the Policy on Clinical Department Faculty Providing Expert Legal Services and Testimony ("Expert Legal Services Policy"). Under these policies, clinical departments within the School of Medicine have an established Departmental Operating Fund to hold income generated by faculty members for outside professional services. The Faculty Affairs Code expressly provides that such funds belong to the Radiology Department and are designed to be "used for professional purposes[.]" However, the Faculty Hearings Committee noted a "lack of clarity . . . on how such funds can and should be used."

hours were expended on personal matters.

Mr. Collichio requested assistance from UNC-CH's Office of University Counsel ("OUC") due to the "unusual" nature of plaintiff's request. On 25 July 2016, Mr. Collichio requested additional documentation and more detailed information relating to plaintiff's relationship with Mintz Levin to determine which legal expenses were "strictly business-related" and potentially reimbursable. Plaintiff provided Mr. Collichio with partially redacted invoices and a copy of the Mintz Levin engagement letter dated 5 February 2016. On 5 August 2016, plaintiff informed Mr. Collichio of his intention to terminate Mintz Levin and "expressed frustration that his reimbursement request had still not been approved[.]" Plaintiff learned on 23 August 2016 that he would not be reimbursed.

Also in August 2016, at the request of OUC, UNC-CH's Chief Audit Officer and Director of the Internal Audit Department, Phyllis Petree ("Ms. Petree") initiated an investigation into plaintiff's reimbursement request to determine whether plaintiff's stated reasons for retaining Mintz Levin were truly for university-related purposes. In addition to investigating plaintiff's relationship with Mintz Levin, Ms. Petree conducted an audit into previous travel and business expenses paid to plaintiff between July 2010 and September 2016. The audit revealed that on multiple occasions dating from 2010, plaintiff received reimbursements for nine trips which were " 'primarily personal in nature and were not reimbursable as business travel.' " It appeared that plaintiff had developed a pattern of planning personal vacations,

and shortly before the trip was scheduled to begin, plaintiff would attempt to schedule work meetings with colleagues abroad to justify multiple days of travel reimbursement requests. Furthermore, the investigation into plaintiff's relationship with Mintz Levin ultimately revealed that plaintiff misrepresented the nature of his reimbursement request in an improper attempt to have the university pay for personal legal expenses. As a result of her findings, Ms. Petree concluded, " 'the primary purpose of the law firm engagement giving rise to the legal fees in question was for personal matters, though [plaintiff] initially represented that the fees were for consultation related to cybersecurity and to his University duties.' "

Ms. Petree's final audit report was issued to Chancellor Folt on 5 January 2017. In a letter dated 11 January 2017, relying on the findings provided by Ms. Petree, Provost Dean informed plaintiff of UNC-CH's intent to discharge him due to misconduct pursuant to Section 3 of the *Trustee Policies and Regulations Governing Academic Tenure in the University of North Carolina at Chapel Hill* (the "Tenure Policy"). The letter stated that plaintiff submitted a reimbursement request for approximately $30,000 in legal fees, "knowingly misrepresenting that these expenses were incurred for legal advice regarding" his professional work, "when, instead, these legal services were obtained for primarily personal reasons, including pursuing possible legal action against the University." The letter further stated plaintiff had established a "pattern of dishonesty and false representations" due to his history of "seeking full reimbursement from the University" for primarily personal

trips and "other costs that cannot be validated due to inadequate documentation[,]" or were not applicable for reimbursement under "state and University policy." Provost Dean estimated that the total amount of "impermissible reimbursements" were "in excess of $27,000." Plaintiff's behavior was described as "unethical conduct" "sufficiently serious as to adversely reflect on [his] honesty, trustworthiness and fitness to be a faculty member." Plaintiff responded on 17 January 2017, and informed Provost Dean of his intent to appeal the discharge decision to the Faculty Hearings Committee (or "the Committee") pursuant to the Tenure Policy.

A hearing regarding plaintiff's appeal was conducted over the course of three days beginning on 23 March 2017 and concluding on 12 April 2017. The stated issues before the Committee included determining whether UNC-CH could prove by the "clear and convincing standard" "whether permissible grounds for [plaintiff]'s discharge exist[ed] under the Tenure Policy and whether those grounds were, in fact, the basis of the University's decision to discharge." Pursuant to Section 3(a)(1) of the Tenure Policy, misconduct justifying discharge may "be either (i) sufficiently related to a faculty member's academic responsibilities as to disqualify the individual from effective performance of university duties, or (ii) sufficiently serious as to adversely reflect on the individual's honesty, trustworthiness or fitness to be a faculty member[.]"

The Faculty Hearings Committee heard testimony from thirteen witnesses, including plaintiff, and examined other documentary evidence relating to plaintiff's

termination. Plaintiff's "central defense . . . was that UNC-CH was retaliating against him for raising prior safety concerns within the Department [of Radiology]." Findings and recommendations of the Committee were issued to Chancellor Folt on 23 May 2017. The Faculty Hearings Committee ultimately rejected plaintiff's retaliation claim finding "no evidence" of retaliation. In pertinent part, the Committee discovered: "[d]espite [plaintiff]'s broad statements in his communication with Mr. Collichio, the specificity of his emails to Mintz Levin . . . make clear that [plaintiff] originally consulted outside counsel because he was considering legal action against the University."

Moreover, the Committee stated:

> We searched and asked specific questions looking for behavior that would indicate some sort of retaliation against [plaintiff] for bringing his safety concerns to the attention of those in the School of Medicine and University administration. We could find no evidence to indicate the University took employment action against [plaintiff] because of his complaints. We could find no evidence that Provost Dean relied on anything other than the grounds found in the Tenure Policy as the basis for his discharge of [plaintiff].

Accordingly, the Committee concluded:

> [Plaintiff]'s choice to seek reimbursement for $30,000 worth of legal fees and his description of the need for this outside legal consultation as being related to various activities such as writing books or considering new safety procedures was disingenuous and dishonest. Indeed, he eventually admitted to Ms. Petree that a significant portion (40%) of his conversations with Mintz Levin were related to taking legal action against the University . . . .

> Such conduct constitutes misconduct of such a nature as to adversely reflect on [plaintiff]'s honesty, trustworthiness and fitness to be a faculty member. Therefore, we find [plaintiff]'s conduct was of such a nature as to indicate that he is unfit to continue as a member of the faculty. We were not convinced that the travel improprieties noted by Ms. Petree by themselves rose to the level requiring discharge since those requests were clear, did reference at least some University-related meetings, and went through multiple levels of review before being granted.

On 9 June 2017, Chancellor Folt notified plaintiff of her decision to accept the findings and recommendations of the Faculty Hearings Committee. Chancellor Folt agreed that plaintiff engaged in misconduct "sufficiently serious" "to render [him] unfit to serve as a member of the faculty" and further concurred with the Committee's absence of findings evidencing retaliation. Pursuant to Section 8 of the Tenure Policy, plaintiff appealed Chancellor Folt's discharge decision to the Board of Trustees ("BOT") on 19 June 2017.

In its decision rendered 1 August 2017, the BOT affirmed Chancellor Folt's decision. Plaintiff appealed the BOT's decision to the BOG on 10 August 2017. The BOG affirmed the dismissal decision on 12 September 2018, concluding "there [wa]s sufficient evidence in the record to determine that [plaintiff] knowingly misrepresented that multiple reimbursement requests for legal and travel expenses were for university purposes when, in fact, substantial portions of the expenses were for personal purposes, constituting misconduct under Section 603(1) of *The Code [of*

*the Board of Governors of The University of North Carolina*].”[4]  Similarly, the BOG found no “evidence to support [plaintiff]’s claim that UNC-CH selected another candidate for the Division Chief position or chose to discharge [plaintiff]” in an act of retaliation “against him for reporting safety concerns about colleagues to UNC-CH administrators.”

Pursuant to N.C. Gen. Stat. § 150B-43, plaintiff petitioned for judicial review of the BOG’s final decision to Orange County Superior Court.  The trial court conducted a *de novo* review of the legal issues and a whole record review of the factual evidence to determine whether plaintiff’s dismissal was supported by substantial evidence in the record.  The proposed issues before the trial court included:

1. Whether the evidence was sufficient to support [plaintiff]’s dismissal from UNC-CH’s School of Medicine based on misconduct.

2. Whether the decision was properly made and consistent with the requirements of Section 603 of [*The Code*] where [plaintiff] claimed that UNC-CH administrators engaged in unethical and illegal conduct related to [plaintiff]’s discharge from employment, including retaliating against him for his reports of safety concerns related to colleagues; and

3. Whether UNC-CH administrators erred by halting [plaintiff]’s pay after the campus-based review process ended with the decision of the [BOT] to uphold [plaintiff]’s dismissal from employment from UNC-CH.

---

[4] *The Code of the Board of Governors of The University of North Carolina* (“*The Code*”) is incorporated into the Tenure Policy.

Per order entered 25 April 2019, the trial court affirmed plaintiff's termination but found UNC-CH wrongfully discontinued his salary in August 2017, stating "[plaintiff] should have been paid through the September 12, 2018 decision of the BOG." With respect to plaintiff's termination, the trial court concluded:

> [T]he decision to discharge [plaintiff] based on misconduct is supported by substantial evidence in the record and is not arbitrary, capricious, or an abuse of discretion. Specifically, substantial evidence in the record supports the conclusion that [plaintiff] submitted to UNC-CH for reimbursement legal fees of approximately $30,000, knowingly, misrepresenting that such expenses were for University business when in fact these legal services were obtained for primarily personal reasons. Substantial evidence in the record further supports that such conduct, as detailed above, constitutes misconduct warranting dismissal, as set forth in Section 603 of *The Code* and in Section 3 of UNC-CH's Tenure Policy.

Plaintiff appealed the trial court's order and UNC cross-appealed the trial court's conclusion of law relating to the discontinuation of plaintiff's salary. *Semelka I*, 275 N.C. App. at 670, 854 S.E.2d at 40. This Court affirmed the trial court's order and held that substantial evidence supported the conclusion that plaintiff engaged in misconduct justifying discharge, discharge was not an excessive discipline in violation of *The Code*, and the BOG's decision to terminate was not an " 'unjust and arbitrary application of disciplinary penalties[.]' " *Id.* at 676-79, 854 S.E.2d at 43-45. We also affirmed the trial court's conclusion that "UNC violated its own policies when it ceased [plaintiff]'s pay at the date of the BOT decision before the BOG issued its ultimate decision." *Id.* at 682, 854 S.E.2d at 47.

Plaintiff commenced the instant action on 11 January 2018 by filing a complaint in Orange County Superior Court (the "Orange County complaint") alleging defendants' initiation of dismissal proceedings against him were retaliatory in violation of the North Carolina Whistleblower Act, N.C. Gen. Stat. § 126-84 *et seq.* (the "Whistleblower Act"). On 10 August 2018, plaintiff voluntarily dismissed the Orange County complaint pursuant to N.C. R. Civ. P. 41(a)(1) and filed a fundamentally similar complaint in Wake County Superior Court (the "Wake County complaint") on 24 August 2018.

Defendants filed a motion to dismiss the Wake County complaint pursuant to N.C. Gen. Stat. § 1A-1, Rules 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6) on 28 September 2018, asserting, among other things, Wake County was an improper venue. Ruling solely on the issue of venue, the trial court denied defendants' motion in an order entered 19 June 2019. In an opinion filed 31 December 2020, we vacated and remanded the trial court's order with instructions to transfer the action to Orange County Superior Court. *Semelka v. Univ. of N. Carolina*, 275 N.C. App. 683, 689, 854 S.E.2d 47, 51 (2020) ("*Semelka II*"). Per order entered 18 August 2021, the case was transferred to Orange County.

Proceedings in the instant case resumed upon plaintiff's scheduling of defendants' original motion to dismiss the Wake County complaint for a hearing on 14 February 2022. Due to uncertainty regarding whether the Wake County motion to dismiss was properly before the trial court, defendants filed an amended motion to

dismiss on 9 February 2022.

The day of the scheduled hearing, defendants filed a second amended motion to dismiss in order to incorporate new legal arguments based on our Supreme Court's order denying plaintiff's request for discretionary review rendered 9 February 2022. Plaintiff challenged the validity of the second amended motion to dismiss arguing defendants are prohibited from amending their motion. The trial court, considering the denial of discretionary review a "significant development[,]" accepted defendants' second amended motion to dismiss finding one month an adequate amount of time for plaintiff to brief and oppose a new argument. Accordingly, the trial court acknowledged defendants' original motion and amended motion to dismiss as withdrawn and scheduled a hearing on the second amended motion to dismiss for the following month.

Defendants' second amended motion to dismiss was heard at the 14 March 2022 session of Orange County Superior Court, Judge Baddour presiding. Defendants argued that the trial court lacked jurisdiction to hear plaintiff's whistleblower complaint as the question of plaintiff's discharge being the result of unlawful retaliation was addressed throughout the administrative process. Defendants attached multiple exhibits to their motion, including: the BOG's decision affirming plaintiff's discharge, plaintiff's petition for judicial review, the trial court's order affirming the BOG's decision to discharge, selected documents from the administrative appeal, and *Semelka I.*

Plaintiff's counsel countered defendants' arguments substantively, but procedurally argued defendants' second amended motion to dismiss ought to be treated as invalid as the Rules of Civil Procedure do not provide an avenue for parties to amend their motions prior to filing an answer. Plaintiff also attached various documents in opposition to defendants' second amended motion to dismiss, including: UNC's notice of intent to discharge dated 11 January 2017, plaintiff's request for a hearing before the Faculty Hearings Committee, the Tenure Policy, and the complete transcript from the Committee hearing.

The trial court entered an order on 24 March 2022 denying defendants' motion in part but granting dismissal of all claims against the individual defendants in their individual capacities. Defendants filed a notice of appeal on 20 April 2022 and plaintiff cross-appealed on 22 April 2022.

## II.    Discussion

At the outset, we must address the interlocutory nature of defendants' appeal.

### A.    Interlocutory Order

An order denying a motion to dismiss is interlocutory because it leaves the matter for further action by the trial court. *See Veazey v. City of Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (citation omitted) ("An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy."), *reh'g denied*, 232 N.C. 744, 59 S.E.2d 429 (1950). "Generally, there is

no right of immediate appeal from interlocutory orders and judgments." *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990). However, "an interlocutory order may be appealed immediately . . . if (i) the trial court certifies the case for immediate appeal pursuant to N.C. [Gen. Stat.] § 1A-1, Rule 54(b), or (ii) the order 'affects a substantial right of the appellant that would be lost without immediate review.' " *McIntyre v. McIntyre*, 175 N.C. App. 558, 562, 623 S.E.2d 828, 831 (2006) (citation omitted).

Defendants concede this appeal as interlocutory, but contend a substantial right is affected as they "ma[k]e a colorable assertion of collateral estoppel" and "are facing a second trial on issues already resolved in [*Semelka I*][.]" Our case law establishes that a trial court's order rejecting the affirmative defense of collateral estoppel can affect a substantial right, however, "incantation of the [doctrine of collateral estoppel] does not . . . automatically entitle a party to an interlocutory appeal[.]" *Foster v. Crandell*, 181 N.C. App. 152, 162, 638 S.E.2d 526, 533-34 (citation omitted), *writ of supersedeas and disc. review denied*, 361 N.C. 567, 650 S.E.2d 602 (Mem) (2007). Thus, we must preliminarily determine whether defendants have made a colorable argument that the doctrine applies in this context in order to allow us to exercise jurisdiction over this appeal.

Although *Semelka I* consists of an administrative action, "it is axiomatic that no one ought to be twice vexed for the same cause[,]" and "[t]his fundamental principle of law applies to administrative decisions." *In re Mitchell,* 88 N.C. App. 602,

604, 364 S.E.2d 177, 179 (1988) (citations omitted). Determining whether an administrative decision enjoys the protections of "*res judicata* depends upon its nature; decisions that are 'judicial' or 'quasi-judicial' can have that effect, decisions that are simply 'administrative' or 'legislative' do not." *Id.* at 605, 364 S.E.2d at 179 (citation omitted). The distinction between a quasi-judicial determination and an administrative one "is not precisely defined," but "courts have consistently found decisions to be quasi-judicial when the administrative body adequately notifies and hears before sanctioning, and when it adequately provides under legislative authority for the proceeding's finality and review." *Id.* (citations omitted).

Here, as illustrated by the facts set forth above, plaintiff appealed Provost Dean's discharge decision pursuant to "Section 3(b)(4) of the Tenure Policy." The appeal was held in accordance with the Tenure Policy, heard before a neutral panel of five faculty members, and plaintiff was represented by counsel. *The Code*, as incorporated into the Tenure Policy, allowed plaintiff to appeal the termination decision to the BOG and N.C. Gen. Stat. § 150B-43 provided plaintiff the right to petition for judicial review. Accordingly, collateral estoppel may apply in the present case as the facts of *Semelka I* were established in a quasi-judicial forum as provided under legislative authority.

"The companion doctrines of *res judicata* (claim preclusion) and collateral estoppel (issue preclusion) have been developed by the courts for the dual purposes of protecting litigants from the burden of relitigating previously decided matters and

promoting judicial economy by preventing needless litigation." *Bockweg v. Anderson*, 333 N.C. 486, 491, 428 S.E.2d 157, 161 (1993) (citation omitted).

> Under the collateral estoppel doctrine, parties and parties in privity with them are precluded from retrying fully litigated issues that were decided in any prior determination and were necessary to the prior determination. The doctrine is designed to prevent repetitious lawsuits, and parties have a *substantial right* to avoid litigating issues that have already been determined by final judgment.

*Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 558, 681 S.E.2d 770, 773 (2009) (emphasis added) (alteration, citation, and internal quotation marks omitted). "An issue is actually litigated, for purposes of collateral estoppel . . . if it is properly raised in the pleadings or otherwise submitted for determination and is in fact determined." *Williams v. Peabody*, 217 N.C. App. 1, 6, 719 S.E.2d 88, 93 (2011) (citation, brackets, and internal quotation marks omitted). "A very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical[;] [i]f they are not identical, then the doctrine of collateral estoppel does not apply." *Id.* (citation and internal quotation marks omitted).

On the other hand, "the rules for determining whether the parties in question are or were in privity with parties in the prior action are not as well defined." *State v. Summers*, 351 N.C. 620, 623, 528 S.E.2d 17, 20 (2000). Our case law describes "privity" as " somewhat elusive" because "no definition of the word . . . can be applied in all cases." *Id.* (citation and internal quotation marks omitted) (quoting *Masters v.*

*Dunstan*, 256 N.C. 520, 524, 124 S.E.2d 574, 577 (1962)). When considering whether privity exists, we must "look beyond the nominal party whose name appears on the record as plaintiff and consider the legal questions raised as they may affect the real party or parties in interest." *Williams*, 217 N.C. App. at 8, 719 S.E.2d at 94 (citation and internal quotation marks omitted). " 'In general, 'privity involves a person so identified in interest with another that he represents the same legal right' previously represented at trial.' " *Summers*, 351 N.C. at 623, 528 S.E.2d at 20 (citations omitted).

To determine whether collateral estoppel applies in the present case we must first determine whether the individual defendants stand in privity with the respondents of *Semelka I*, UNC and UNC-CH. Plaintiff argues the individual defendants do not share privity as they "had no ability to direct the course of the litigation" and cannot be bound by a judgment to which they were not named parties. This application of privity is incorrect.

Plaintiff's recitation of privity derives from case law established prior to our Supreme Court's elimination of the mutuality requirement of collateral estoppel in *Thomas M. McInnis & Assocs., Inc. v. Hall*, 318 N.C. 421, 434, 349 S.E.2d 552, 560 (1986). Contrary to plaintiff's contention, "[w]here a litigant seeks to assert collateral estoppel defensively," mutuality of estoppel is not required. *Johnson v. Smith*, 97 N.C. App. 450, 453, 388 S.E.2d 582, 584 (citation omitted), *disc. review denied*, 326 N.C. 596, 393 S.E.2d 878 (Mem) (1990). Thus, "the litigant invoking collateral

estoppel need not have been a party to or in privity with a party to the first lawsuit 'as long as the party to be collaterally estopped had a full and fair opportunity to litigate the issue in the earlier action.' " *Id.* (citation omitted). Here, it is apparent that plaintiff received a full and fair opportunity to challenge his discharge as a three-day hearing was held before the Faculty Hearings Committee.

Likewise, plaintiff's complaint in the instant case, along with a review of the circumstances underlying plaintiff's termination, lead us to conclude that *Semelka I* involved identical issues previously litigated, actually determined, and necessary to the overall disposition regarding plaintiff's discharge. As indicated above, the issues presented to the Faculty Hearings Committee included determining "whether permissible grounds for [plaintiff]'s discharge existe[d] under the Tenure Policy and whether those grounds were, in fact, the basis of the University's decision to discharge." The Committee's findings illustrate that a critical component of their overall decision regarding plaintiff's termination included examining potential retaliation on behalf of the individual defendants due to plaintiff bringing his "long-standing concerns about safety" in the Radiology Department to the attention of university administration, a central feature of plaintiff's complaint in the instant case. In fact, the Committee noted that they were "struck by the seriousness" of plaintiff's allegations yet found "sufficient evidence . . . that the University ha[d] met its burden in acknowledging and investigating [plaintiff]'s concerns."

In sum, *Semelka I* upheld plaintiff's termination, was a final judgment on the

merits, and facts relating to plaintiff's termination being the result of retaliation were actually litigated and necessary to the judgment. *See City of Asheville v. State*, 192 N.C. App. 1, 14, 665 S.E.2d 103, 115 (2008) (citation omitted) (" '[A]ny right, fact, or question in issue and directly adjudicated on or necessarily involved in the determination of an action . . . on the merits is conclusively settled . . . and cannot again be litigated between the parties and privies.' "), *appeal dismissed and disc. review denied*, 672 S.E.2d 685 (Mem) (2009). We disagree with plaintiff's assertion that collateral estoppel may not apply to *Semelka I* because the administrative forum hardly "provide[d] [him] with a full opportunity to litigate his case." It is well-settled that a party is not entitled to relitigate facts previously determined in a prior action, even if that prior action was held in an administrative capacity. *Swain v. Efland*, 145 N.C. App. 383, 389, 550 S.E.2d 530, 535 (finding parties cannot maintain both an administrative action and an action in superior court as "this would allow [parties] two bites of the apple, could lead to the possibility that different forums would reach opposite decisions, as well as engender needless litigation"), *cert. denied*, 354 N.C. 228, 554 S.E.2d 832 (Mem) (2001); *See also Univ. of Tenn. v. Elliott*, 478 U.S. 788, 797, 92 L. Ed. 2d 635, 645 (1986) ("[I]t is sound policy to apply principles of issue preclusion to the fact-finding of administrative bodies acting in a judicial capacity.").

Accordingly, we conclude that defendants' motion to dismiss raises a colorable assertion of collateral estoppel and defendants' appeal is properly before this Court. Having determined that findings from *Semelka I* may serve as a bar to plaintiff's

whistleblower action, we now turn to address the merits of defendants' appeal.

## B.     Standard of Review

Defendants moved to dismiss plaintiff's complaint pursuant to Rules 12(b)(1), (2), and (6) of the North Carolina Rules of Civil Procedure. *See* N.C. Gen. Stat. § 1A-1, Rule 12(b)(1) (2022) (lack of subject matter jurisdiction); N.C. Gen. Stat. § 1A-1 Rule 12(b)(2) (2022) (lack of personal jurisdiction); N.C. Gen. Stat. § 1A-1 Rule 12(b)(6) (2022) (failure to state a claim upon which relief can be granted). However, defendants' arguments on appeal focus exclusively on the doctrine of collateral estoppel and plaintiff's ability to state a claim under the Whistleblower Act. Thus, we focus our analysis on Rule 12(b)(6). *Hillsboro Partners, LLC v. City of Fayetteville*, 226 N.C. App. 30, 32, 738 S.E.2d 819, 822 ("Because in this case the fact that defendant argues plaintiff is collaterally estopped from contesting relates to plaintiff's ability to state a claim, rather than a jurisdictional issue, it is properly analyzed under Rule 12(b)(6)[.]"), *disc. review denied*, 367 N.C. 236, 748 S.E.2d 544 (Mem) (2013).

This Court conducts a *de novo* review of a trial court's order on a motion to dismiss. *Sykes v. Blue Cross and Blue Shield of N.C.*, 372 N.C. 318, 324, 828 S.E.2d 489, 494 (citation omitted), *reh'g denied*, 372 N.C. 710, 830 S.E.2d 823 (Mem) (2019). "In doing so, the Court must consider 'whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory.'" *Id.* (citations omitted). However, dismissal is proper when: "(1)

the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Wood v. Guilford Cnty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citation omitted).

### C.    Plaintiff's Whistleblower Claims

Defendants argue the trial court erred in denying their motion to dismiss as plaintiff is precluded from establishing the elements of his whistleblower claims because *Semelka I* determined that his discharge was (1) "proper" and (2) "not retaliatory[.]" We agree.

In order to assert a *prima facie* showing of retaliatory termination in violation of the Whistleblower Act, "a plaintiff must establish:  (1) that the plaintiff engaged in a protected activity, (2) that the defendant took adverse action against the plaintiff in his or her employment, and (3) that there is a causal connection between the protected activity and the adverse action taken[.]" *Manickavasagar v. N.C. Dep't of Pub. Safety*, 238 N.C. App. 418, 428, 767 S.E.2d 652, 658 (2014) (citation omitted). "There are at least three distinct ways for a plaintiff to establish a causal connection between the protected activity and the adverse employment action under the Whistleblower Act." *Newberne v. Dep't of Crime Control and Pub. Safety*, 359 N.C. 782, 790, 618 S.E.2d 201, 207 (2005).

"First, a plaintiff may rely on the employer's 'admission that it took adverse action against the plaintiff solely because of the plaintiff's protected activity.'" *Id.* (citation and brackets omitted). "Second, a plaintiff may seek to establish by circumstantial evidence that the adverse employment action was retaliatory and that the employer's proffered explanation for the action was pretextual." *Id.* (citation omitted).

> [O]nce a plaintiff establishes a prime facie case of unlawful retaliation, the burden shifts to the defendant to articulate a lawful reason for the employment action at issue. If the defendant meets this burden of production, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered explanation is pretextual. The ultimate burden of persuasion rests at all times with the plaintiff.

*Id.* at 791, 618 S.E.2d at 207-208 (citations omitted).

> Third, when the employer claims to have had a good reason for taking the adverse action but the employee has direct evidence of a retaliatory motive, a plaintiff may seek to prove that, even if a legitimate basis for discipline existed, unlawful retaliation was nonetheless a substantial causative factor for the adverse action taken. Cases in this category are commonly referred to as "mixed motive" cases.

*Id.* at 791, 618 S.E.2d at 208 (citations and internal quotation marks omitted). Contrary to the burden-shifting analysis of cases in the second category, "the ultimate burden of persuasion in a 'mixed motive' case may be allocated to the defendant once a plaintiff has established a prima facie case." *Id.* at 792, 618 S.E.2d at 208. "In order to shift the burden to the defendant, however, the plaintiff must first demonstrate 'by

*direct evidence* that an illegitimate criterion was a substantial factor in the decision.' " *Id.* (emphasis in original) (citations omitted).

In the case *sub judice*, the question we are tasked with considering is plaintiff's ability to satisfy the third element of a whistleblower action: a causal connection between his report of health and safety concerns to university administration and his subsequent termination. *See id.* Plaintiff argues, primarily, that he is not collaterally estopped from pursuing a whistleblower claim as *Semelka I* did not involve a cause of action under the Whistleblower Act and only concerned questions of violation under the Tenure Policy. Specifically, plaintiff contends retaliation was only mentioned in context and due to its immateriality, plaintiff may still successfully prove his discharge was an act of unlawful retaliation. We disagree.

Plaintiff's arguments rest on the third theory of causation established by our Supreme Court in *Newberne*. Plaintiff argues that although he was terminated for violating the Tenure Policy, he may still "seek to prove that, even if a legitimate basis for discipline existed, unlawful retaliation was nonetheless a substantial causative factor for the adverse action taken." *Newberne*, 359 N.C. at 791, 618 S.E.2d at 208 (citation omitted). However, plaintiff's contention is misplaced as cases under the "mixed motive" theory of causation require plaintiffs to satisfy the initial burden that the "protected conduct was a 'substantial' or 'motivating' factor for the adverse employment action" with "*direct evidence* that an illegitimate criterion was a substantial factor in [the adverse action]." *Id.* at 792, 618 S.E.2d at 208 (emphasis in

original) (citations omitted). Only upon this initial showing does the burden shift to defendant to "prove by a preponderance of the evidence that it would have reached the same decision as to [the employment action at issue] even in the absence of the protected conduct." *Id.* at 791-92, 618 S.E.2d at 208 (citations and internal quotation marks omitted). Here, a review of the allegations contained in the complaint, in addition to certain facts established in *Semelka I*, indicate plaintiff's inability to prove his report of health and safety concerns to Chancellor Folt played a substantial factor in his termination.

Plaintiff's complaint states that he retained the legal services of Mintz Levin "for purposes of assisting him in presenting" his concerns to the BOT "in an effort to protect . . . patients and staff." Plaintiff purportedly sought reimbursement of the legal fees because "his primary purpose in retaining [legal services] was not for personal benefit, but ultimately for the benefit of UNC-CH's School of Medicine." As alleged by plaintiff, it was this retention of legal counsel which led defendants to unlawfully retaliate against him. In fact, plaintiff contends, "[a]t no time did [he] ever exhibit a 'pattern of dishonesty' related to" his legal reimbursement request, yet defendants utilized this as a "pretext to retaliate against [him] for" reporting "health, safety, and hostile work environment concerns to [Chancellor Folt]" and "seeking to report the same to the [BOT] and potentially [the BOG]." Plaintiff argues that, in essence, the audit and internal investigation was used to wrongly characterize his request for reimbursement of legal fees as a violation of the Tenure Policy.

We disagree with plaintiff's interpretation of the facts underlying his termination. Despite plaintiff's assertion that the internal investigation was used as a pretext for retaliation, the facts indicate that the audit was conducted due to the "unusual" nature of plaintiff's request for reimbursement of legal fees and the ambiguity of his stated reasons for the reimbursement. Plaintiff reported to Mr. Collichio that the legal services were retained for consultations "concerning a book he might write, safety standards, drug development, staff burn-out and IRB issues." When plaintiff was asked for further explanation pertaining to his request, he provided partially redacted invoices and vague emails. Only then did Ms. Petree decide to conduct an audit to "ascertain whether his stated reasons for engaging Mintz Levin were indeed true" and not "for personal purposes." It was only upon a review of plaintiff's own communications with Mintz Levin did the audit reveal that plaintiff was discussing the potential of "large monetary settlements and promotions that he would like . . . in order for him to refrain from publicly disclosing his safety concerns." Consequently, the Faculty Hearings Committee concluded that despite plaintiff's ambiguity in his stated reasons for the reimbursement, "the specificity of his emails . . . dated January 1 and 6, 2016, make clear that [plaintiff] originally consulted with outside counsel because he was considering legal action against the University." Thus, the Committee ultimately concluded that plaintiff's deliberate obscurity of the need for outside legal consultation was "disingenuous and dishonest"

and "constitute[d] misconduct of such a nature as to adversely reflect on [plaintiff]'s honesty, trustworthiness, and fitness to be a faculty member."

In conclusion, plaintiff cannot establish a *prime facie* case of whistleblower retaliation as his discharge was the result of legitimate, non-retaliatory reasons related to his misrepresentations in seeking reimbursement for $30,000 in personal legal fees. *Newberne*, 359 N.C. at 795, 618 S.E.2d at 210 (emphasis added) (citation omitted) ("[A] trial court ruling on a Rule 12(b)(6) motion to dismiss a whistleblowing claim should look at the face of the complaint to determine whether the factual allegations, if true, would sustain a claim for relief under *any* viable theory of causation."). Accordingly, plaintiff's arguments to the contrary are overruled.

### III.  Cross-Appeal

On cross-appeal, plaintiff contends defendants' second amended motion to dismiss is a "nullity[,]" therefore the trial court's order dismissing claims against the individual defendants in their individual capacities is error. As indicated above, plaintiff is collaterally estopped from pursuing a cause of action under the Whistleblower Act, accordingly, remaining arguments pertaining to claims against the individual defendants are moot.

### IV.  Conclusion

For the foregoing reasons, we reverse the trial court's order denying defendants' motion to dismiss. Plaintiff's cross-appeal is dismissed as moot.

REVERSED; CROSS-APPEAL DISMISSED.

Judges HAMPSON and GRIFFIN concur.